UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANITA KUBICKA, on behalf of herself and all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) |
| MONTCLAIR STATE UNIVERSITY, JONATHAN KOPPELL, President of Montclair State University, individually and in his official capacity, DAVID L. VERNON, Vice President of Human Resources of Montclair State University, individually and in his official capacity, and CARLY HAMILTON, Assistant Vice President, Employee and Labor Relations of Montclair State University, individually, and in her official capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Civil Action No.

Plaintiff Anita Kubicka, by her attorneys, as and for her Complaint against defendants, states:

**INTRODUCTION**

1.      Plaintiff Anita Kubicka ("Coach Kubicka" or "Plaintiff"), residing at 30 Maurice Avenue, Holmdel, New Jersey 07733, on behalf of herself and all others similarly situated ("the MSU Class") as to Counts One through Six, and on behalf of herself alone as to Counts Seven through Twelve, brings this action against Montclair State University ("MSU"), a New Jersey public institution of higher education, MSU President Jonathan Koppell, in his individual capacity (for damages) and in his official capacity (for injunctive relief), David L. Vernon, in his individual capacity (for damages) and in his official capacity (for injunctive relief), and Carly

1

Hamilton, in her individual capacity (for damages) and in her official capacity (for injunctive relief), whose principal place of business is located at 1 Normal Avenue, Montclair, New Jersey 07043, for gender discrimination and deprivation of plaintiff's federal and state constitutional, statutory and common-law rights, resulting in a hostile work environment, wrongful termination and long-term damage to her college coaching career. Coach Kubicka also alleges that defendants have retaliated against her assertion of gender discrimination by refusing to conduct a fair, neutral and effective investigation despite known risks that gender stereotypes and socialization influenced the information used to justify her suspension and termination.

2.     This action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII)", Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX"), 42 U.S.C. § 1983, the Due Process Clause of the Fourteenth Amendment, the New Jersey Constitution and applicable New Jersey state law.

## JURISDICTION AND VENUE

3.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367(a).

4.     Venue in this District is proper under 28 U.S.C. §1391(b)(1) and (2).

5.     Anita Kubicka's EEOC charge against defendant was filed on May 16, 2023.

6.     The EEOC charge alleged, inter alia, that defendant discriminated against Anita Kubicka on the basis of sex.

7.     The EEOC issued a Notice of Right to Sue and this action is being brought within ninety (90) days of the issuance of the Notice of Right to Sue pursuant to the parties' tolling agreement.

## PARTIES

8.      Plaintiff Anita Kubicka is a female citizen of New Jersey.  Before MSU suspended her as of April 13, 2023, Coach Kubicka had been an athletic coach at MSU for 33 years --- most recently as the multiple award-winning Head Coach of Softball since 1990. Among many other distinctions, she is a six-time New Jersey Athletic Association Softball Coach of the Year, a six-time National Fastpitch Coaches Association (NFCA) Regional Coach of the Year, a member of the NFCA Hall of Fame, and a member of the Montclair State University Hall of Fame.  Her teams won 966 NCAA softball games under her leadership, and 39 of her athletes were named NFCA All Americans, five were named New Jersey Athletic Conference – (NJAC) Softball Player of the Year, and two were named NJAC Female Athlete of the Year.

9.      Defendant Montclair State University is a New Jersey state-owned public institution of higher education whose athletic teams participate in the NCAA Division III – New Jersey Athletic Conference.

10.     Defendant Jonathan Koppell is President of Montclair State University. As President, Koppell is the chief executive officer of the University and bears ultimate statutory and institutional responsibility for professional staff employment decisions, including the reappointment and non-renewal of coaches. Under NJSA 18A:60-14, President Koppell is statutorily required to notify professional staff of the renewal or non-renewal of their contracts "not later than 1 year prior to the expiration of such contracts." Despite receiving the recommendation and approval of Coach Kubicka's five-year reappointment from Vice-President Soufleris on March 23, 2023, President Koppell failed and refused to execute or authorize the reappointment contract. Upon information and belief, President Koppell personally decided to withhold his signature from Coach Kubicka's approved reappointment, personally approved or

ratified the decision to suspend Coach Kubicka and investigate her based on unverified allegations, personally approved or ratified the decision not to renew Coach Kubicka's contract, and personally failed to ensure that Coach Kubicka received constitutionally adequate due process before being deprived of her property and liberty interests. President Koppell is also responsible for establishing and maintaining the institutional policies governing coach evaluation, investigation of complaints and discipline that, as applied, discriminated against Coach Kubicka on the basis of gender.

11.     Defendant David L. Vernon is Vice President of Human Resources of Montclair State University. In that capacity, Vernon exercised decision-making authority over employment actions for professional staff, including the decision to terminate plaintiff's employment. Vernon personally reviewed and approved the decision not to renew Coach Kubicka's contract, and signed the February 7, 2024 letter formally terminating plaintiff's employment. Upon information and belief, Vernon personally decided to withhold the investigation report from Coach Kubicka and her counsel.

12.     Defendant Carly Hamilton is Assistant Vice President, Employee and Labor Relations of Montclair State University. In that capacity, Hamilton exercised decision-making authority over employee discipline and investigations, personally directed and oversaw the investigation of Coach Kubicka, personally decided to suspend Coach Kubicka without providing her notice of the specific allegations against her, personally decided to recommend non-renewal of Coach Kubicka's contract based on the investigation findings, signed the April 13, 2023 letter suspending plaintiff "based on recent allegations of misconduct in your role as Assistant Director/Head Coach of Softball within Montclair State University Athletics Department . . . pending an investigation into the alleged misconduct," and on September 6, 2023

informed plaintiff orally that, based on the findings of that purported investigation, plaintiff's employment would not be renewed.

13.    Defendants Koppell, Vernon and Hamilton acted under color of state law in their capacities as officials of MSU, a New Jersey state institution.

## SUMMARY OF CLAIMS

14.    Plaintiff Anita Kubicka alleges that defendants (hereinafter collectively "Montclair State University" or "MSU") violated her due process rights under the Fourteenth Amendment of the United States Constitution. Despite receiving written notification on March 23, 2023, that her reappointment for a new five-year term had been enthusiastically recommended and approved—which notification represented the final step in MSU's reappointment approval process and created a vested property interest in continued employment—she was suspended without notice of specific allegations on April 13, 2023, and later informed on September 6, 2023 that her contract would not be renewed. This suspension and non-renewal were based on unspecified findings of "misconduct" that stigmatized Coach Kubicka and damaged her professional reputation, yet she was never provided notice of the specific allegations, a copy of the investigation report, or a meaningful opportunity to respond before the decision was made. This notification of non-renewal was both procedurally deficient under New Jersey law (NJSA 18A:60-14) and constituted a deprivation of her property and liberty interests in continued employment and professional reputation without due process of law.

15.    Plaintiff Anita Kubicka, on behalf of herself and the MSU Class, alleges that Montclair State University participates in the nationwide practice of illegal segregation and limitation of the hiring and retention of female coaches in violation of Title VII and Title IX.

16.     Plaintiff and the MSU Class have been forced to work under added pressure and double standards generated by commonly-held gender stereotypes. These stereotypes imposed additional burdens on them that were not imposed on male coaches, in the form of differential expectations, added pressure and invalid complaints about their coaching methods. Coach Kubicka and the MSU Class also have faced burdens imposed by stereotypes held by those working in athletic administration at MSU --- stereotypes that created additional expectations for female coaches and caused the administration to respond differently to complaints made by female athletes than to complaints made by male athletes. Coach Kubicka and the MSU Class have been required to do more work for less pay than male coaches because of their gender and the gender of their teams.

17.     Coach Kubicka and the MSU Class have been subjected to a hostile work environment caused by altered working conditions brought about by the extra work, pressure and double standards placed on them by unmanaged gender stereotypes resulting from MSU's participation in the industry-wide practice of illegal gender segregation.

18.     For all Title VII and Title IX claims---hostile environment, discrimination and wrongful discharge---plaintiff challenges decisions resulting from a policy or practice causing disparate negative impact on women and forming part of a pattern and practice of discrimination. For each such cause of action, Coach Kubicka brings claims for herself individually as well as for the members of the MSU Class, who have been similarly impacted by the negative effects of gender segregation and stereotypes.

19.     **In summary, plaintiff brings this action to challenge Montclair State University's participation in the nationwide practice that burdens women in athletics with the effects of gender stereotypes.  In addition to legal and equitable relief for herself,**

plaintiff seeks an injunction on behalf of the MSU Class requiring Montclair State University to change its training, recruiting, hiring and discipline practices to eliminate this form of illegal gender segregation and discrimination.

<u>BACKGROUND, ORIGIN AND CONSEQUENCES OF ILLEGAL GENDER SEGREGATION</u>

I.    <u>Illegal Gender Segregation</u>

A.    <u>Illegal gender segregation arising from, and perpetuating, illegal gender stereotypes</u>

20.    College athletics, unlike most industries in the U.S., remains effectively segregated by gender. Female coaches are segregated in that they are effectively prohibited from coaching men and are limited to coaching only a certain percentage of women. Men are permitted to coach all men's teams and are fully embraced in coaching women's teams as well.

21.    The practice of allowing female coaches to coach only women and/or limiting the number of female head coaches in women's athletics constitutes illegal segregation in violation of 42 U.S.C § 2000e-2(a)(2).

22.    De facto segregation occurs when a university, through its standard operations or practices, permits, enables or enforces illegal segregation, or places systemic limitations on hiring women, regardless of any formal policy or openly-stated belief. The decisions that cause a university to permit, enable or enforce illegal segregation are driven by gender stereotypes regarding women's ability to coach and their appropriate role in athletics.

23.    Today, de facto gender segregation exists in virtually every university in the United States. Its continued enforcement results from the failure to recruit, consider or encourage the hiring of females for head and assistant coaching positions in male programs, and the concomitant practice of actively recruiting and hiring men to coach women at equal or higher

7

rates as their female coach counterparts.   The result is that less than 45% of women's athletic teams are coached by women.

24.    The exclusion of women from coaching men and the limitation on women coaching women continue to be enforced through several overlapping forces:

- **Perpetuation of Stereotypes**: Segregation in athletics perpetuates stereotypes that women are not as effective at coaching as men. These stereotypes (that men are stronger leaders/coaches, that women must exhibit feminine traits to be liked, etc.) exist throughout society and are particularly impactful in college and professional sports.

- **Career Opportunity Limitation**: Women considering coaching careers observe that they are not permitted to coach men and are limited to coaching less than 45% of women. This negatively impacts women's interest in pursuing coaching positions. Women are socialized with an implicit understanding that they will not be considered able to coach by the team, administration and fan base.

- **Increased Work Burden**: Women like Anita Kubicka who do become head coaches are required to do more work to manage stereotype-driven double standards than their male peers. Women receive more unsubstantiated complaints and are often fired for them, despite doing extra work to prevent these complaints and engaging in no improper coaching methods.

- **Career Damage Cycle**: Once a woman is fired from a coaching position for alleged wrongdoing, her career opportunities become severely limited. This cyclical process limits the number of women interested in coaching, places added work and causes increased burn-out among those who retain positions, and creates a high risk of dismissal because of stereotype-driven complaints.

### B. Montclair State University Practices Illegal Gender Segregation

25.    Defendant Montclair State University has engaged in illegal segregation for many years.

26.    Montclair State University has only one female coach coaching men's teams out of a total of nine positions coaching men, yet six male coaches coach women's teams out of a total of 11. Furthermore, there are only two female assistant coaches of men's teams out of

33 assistant coach positions, while there are 12 male assistant coaches of women's teams out of a total of 27.

27.     Gender segregation in college athletics is not "separate but equal," but rather a one-way segregation that gives men exclusive access to coaching men and disproportionately greater access to coaching women when compared to the opportunities given to female coaches.

28.     Defendant Montclair State University's participation in de facto segregation against women constitutes a separate claim under 42 U.S.C § 2000e-2(a)(2) and supports a claim for a hostile work environment, regardless of whether the female coach ever applied for a position to coach men.

## C. Systemic Gender Segregation in Public Universities Throughout New Jersey

29.     Montclair State University's participation in this discriminatory pattern is not isolated but reflects a systemic practice of gender segregation in coaching positions across all public universities in New Jersey. Comprehensive data from these institutions reveals a clear and consistent pattern of excluding women from coaching men's teams while allowing men significant access to coaching women's teams.

30.     The data from all public universities in New Jersey demonstrates an overwhelming pattern of gender segregation:

- **Head Coaches of Men's Teams**: Out of 91 head coaching positions for men's teams across New Jersey's public universities, only seven (7.7%) are filled by women. The vast majority of universities, including The College of New Jersey, Rutgers University-Newark, New Jersey City University, NJIT, Rowan University, Stockton University, William Paterson University, and Rutgers University-New Brunswick, have **no** female head coaches for any men's teams.

- **Head Coaches of Women's Teams**: Out of 108 head coaching positions for women's teams, 40 (37.0%) are filled by men. This demonstrates the one-way nature of the segregation, where men have access to coaching positions for both genders while women are effectively limited to coaching only women.

9

- **Assistant Coaches of Men's Teams**: Of 314 assistant coaching positions for men's teams across these universities, only 30 (9.6%) are filled by women. This represents a systemic barrier to entry-level positions that would provide women with experience coaching men's teams.

- **Assistant Coaches of Women's Teams**: Of 281 assistant coaching positions for women's teams, 120 (42.7%) are filled by men. This further demonstrates the asymmetrical access that favors male coaches.

31.     This universal pattern across New Jersey's public universities demonstrates that MSU's segregated coaching structure is not an isolated practice, but instead part of a systemic pattern of discrimination that limits opportunities for female coaches throughout the state's higher education system.

32.     The fact that defendant Montclair State University permits, enables or enforces de facto segregation is per se evidence of a hostile work environment and wrongful termination based on gender stereotyping, in violation of 42 U.S.C § 2000e-2(a)(1).

33.     The effects of segregation in athletics support a claim of gender discrimination in two primary ways:

- First, continued illegal segregation supports the **perpetuation of gender stereotypes** in the minds of every person who lives or works in the college sports system. Just as racial segregation could not remain in place without widespread stereotypes, the same is true for gender segregation in athletics today.

- Second, the effects of segregation create **added work for a female coach** as she must walk the narrow path required to maintain her coaching position and manage the double standards placed upon her by the pressure of gender stereotypes.

34.     The following male coaches at Montclair State University directly benefit from this system of segregation in terms of hiring opportunities, career advancement and freedom from the double bind that restricts female coaches like Anita Kubicka:

10

35.    Rick Giancola, retired Head Coach of Football, enjoys career opportunities entirely foreclosed to female coaches because women are effectively barred from coaching football at any level.

36.    Justin Potts, Head Coach of Men's Basketball, operates in a sport where female coaches are systematically excluded without any legitimate basis for such exclusion. Potts commonly uses direct communication styles and demanding performance expectations that, when employed by female coaches, are often mischaracterized as "toxic" or "abusive." For male coaches, however, the same actions are deemed appropriate "coaching intensity" rather than misconduct.

37.    Dave Lorber, Head Coach of Baseball, regularly imposes consequences for performance issues without those actions being labeled as "targeting" or "creating a toxic environment." His strict disciplinary approach, including benching underperforming players and confrontational meetings, is characterized as "holding players accountable" rather than misconduct, but identical methods used by female coaches are deemed inappropriate.

38.    Brian McLaughlin, Head Coach of Men's and Women's Swim, demonstrates the one-way nature of segregation in athletics: men can coach both men's and women's teams, but women are rarely permitted to coach men's teams. As a male coach of both men's and women's teams, McLaughlin maintains consistent coaching standards across both teams without facing gender-based critique. His demanding workouts, direct criticism and raised voice during competition---methods comparable to or exceeding the allegations against Coach Kubicka---are characterized as "high standards" rather than misconduct.

39.    We do not allege that these male coaches engage in inappropriate behavior, but rather that such standard coaching practices (clear performance expectations, direct

communication and accountability measures) are interpreted differently when employed by female coaches. When male coaches establish performance consequences or provide direct feedback, these actions are typically viewed through a neutral or positive lens. When female coaches apply the same methods, their actions most often are viewed as abusive.

40.    All of these male coaches benefit from freedom from the double bind that constrains female coaches. Male coaches can be direct, demanding and firm without being labeled "aggressive" or "difficult." They can raise their voices without being called "emotional." They can demand excellence without being deemed "unfriendly." They can focus on performance rather than on athletes' feelings, without being considered "cold." And they can discipline athletes without accusations of "bullying." These freedoms allow male coaches to perform their jobs without the additional work of constant self-monitoring and stereotyped gender conformity that is required of Coach Kubicka and other female coaches.

## II.    Gender Stereotypes Adversely Affect Female Coaches

### A.    Gender Stereotypes Imposed on Female Coaches

41.    Female coaches are expected to behave in a manner that is consistent with societal stereotypes about females.

42.    Societal expectations of females include that they identify with the role of family caretaker/nurturer, not the role of a "leader," such as a head coach.

43.    The role of leader, or head coach, was designed and remains defined as a "male-type" task. Coaching behavior, therefore, is supposed to be consistent with expectations of how a male should behave, not a female. The fact that head coaching positions remain associated with male-type tasks or behavior results from gender stereotyping.

44.    These expectations or stereotypes about the roles of females in society create what is called a "lack of fit" or "role incongruity," whereby women holding high-level positions such as administrator or head coach are considered inappropriate for those positions if they fail to exhibit traditionally "masculine" leadership qualities.

45.    This lack of fit leads students, parents and administrators to evaluate the behavior of female coaches differently from the behavior of male coaches. This differential evaluation occurs regardless of whether the team is comprised of male or female athletes.

46.    As a result of stereotypes, a female coach who behaves in a stereotypically feminine manner is faulted for being "too soft" or "effeminate" in her coaching style. A female coach who behaves in the way we expect head coaches to behave (i.e., male-type tasks and behavior) is often faulted for being "too harsh" or "aggressive."

47.    Males are not similarly evaluated based on this double standard.

48.    The double standards, "lack of fit" analysis and stereotyping often result in a litany of student-athlete complaints against female coaches.

49.    These student-athlete complaints occur even though the female coaches are not coaching any differently, and certainly no more harshly, than similarly-situated male coaches. The stereotyped beliefs held by most athletes, parents and administrators will regularly cause an athlete or parent to misjudge a female's normal coaching methods or behavior as somehow inappropriate or incongruent with the putative complainant's expectations.

50.    A female coach's actions are misinterpreted due to stereotyping, and she is blamed for the feelings of the athletes. Societal and systemic stereotypes cause us to expect female coaches to manage and control the feelings of their athletes: to ensure they are happy, have no hurt feelings, and do not fear emotional or physical harm. This socialized role of how a

13

woman is supposed to behave when dealing with the emotional or physical fears of young adults is inconsistent with the profession of college coaching, which requires coaches to impose stress on athletes to help them achieve their highest physical and mental performance.

51.    Athletes expect collegiate and professional coaches to be firm, direct and even authoritarian at times. However, those characteristics are more consistent with the common expectations of how men are supposed to behave, not women. When a female coach seeks to exhibit behavior that fits with the expected role of a head coach (firm, direct, authoritarian), she will often receive backlash in the form of complaints or negative evaluations.

**B.  Added Stereotype Risks Resulting from Gender Socialization**

52.    Gendered socialization covers many aspects of how children are raised and learn from their environment. In this context, it refers to the differences in how young men and young women report their emotional responses to perceived risks of emotional or physical harm.

53.    Men and women feel emotion (fear, worry, insecurity, threat) in similar ways, but they are often socialized to express that emotion differently. Young women are socialized to report emotion and risk more openly to each other, to parents and to other third parties, while young men are socialized to refrain from reporting their emotions or potential risks.

54.    Gender socialization results in more concerns about emotional or physical risk being raised to university administrations by female athletes than by male athletes. This creates a false data set or misperception that a coach of a female team (regardless of coach's gender) is getting more complaints than a coach of a men's team. Gender socialization also creates pressure to respond differently to concerns raised by male or female athletes. Administrations will often try to manage, fix or protect the female athlete's feelings while limiting or responding negatively to concerns raised by males for the same type of behavior.

14

55.    As a result of these gendered socialization differences, coaches of female programs receive more student-athlete complaints than coaches of male programs, regardless of whether the coaches are behaving any differently toward the athletes.

56.    MSU is fully aware that female teams make more complaints about their coaches than male teams, despite the coaches' use of the same or similar coaching methodologies.

57.    When a report is made about the behavior of a female coach, a university is more likely to fault the female coach than it would be to fault a male coach for engaging in the same behavior. Because of gender stereotypes and gendered socialization, a university will fault the female coach in several ways:

- The university will fault the female coach for the mere fact that the athletes claim to be harmed or feel negative emotions.

- The university will act more quickly, and with less evidence than for men, to fault the female coach for any mistake, act of poor judgment or out-of-context comment.

- The university will place pressure on the coach to "fix" the problem by changing her communication style or coaching methods.

58.    Complaints about Anita Kubicka were, at least in part, the result of gendered socialization and the differential gendered expectations placed on her as a female coach.

59.    Gender socialization is a form of gender stereotyping. Gender stereotypes cause young men and women to feel they are expected to report or not report risk, and gender stereotypes in university administrations create differential responses to reports by male or female athletes, which in turn entrenches the socialized expectation that male and female athletes report these risks in different ways.

**C.  MSU's Knowledge of Stereotype Risk and Breach of its Duty of Care**

60.    Montclair State University has a duty to exercise reasonable care to prevent reliance on stereotypes that negatively impact women in athletics. This duty is the result of: (i) the direct obligation to prevent all forms of discrimination under Title VII and state law; (ii) the added obligation created by Title IX to exercise awareness of the risks of gender discrimination; and (iii) the general knowledge of the risks of gender stereotyping, as well as the training provided by the University that creates awareness of these risks.

61.    Montclair State University's participation in the segregation of females from coaching males is evidence of actual knowledge of the risk of stereotypes impacting women, and is also constructive knowledge of this risk as a matter of law.

62.    Montclair State University knew or should have known that the complaints made about Anita Kubicka by athletes were influenced by gender stereotypes.

63.    Because of the University's knowledge of the risks inherent in a gendered, segregated system and the attendant legal duty to avoid those risks, the University had an obligation to exercise due care in its response to the complaints about Anita Kubicka.

64.    Defendant Montclair State University failed to exercise reasonable care in collecting the complaints.

65.    Montclair State University failed to require that athletes and other complainants be notified of or trained on the risks of gender stereotyping. Montclair State University's process has no accountability measures to reduce the impact of stereotypes and implicit biases.

**STATEMENT OF FACTS**

66.    Montclair State University employed Anita Kubicka for 33 years.

67.    On March 23, 2023, Coach Kubicka received written notification from MSU that her reappointment for a new five-year term (July 1, 2024 through June 30, 2029) had been

enthusiastically recommended by her supervisor Robert Chesney and approved by Dawn Soufleris, Vice-President of Montclair State for Student Development and Campus Life. This written approval represented the final substantive review and approval in MSU's reappointment process for professional staff in Coach Kubicka's position, with only the ministerial act of presidential execution of the contract remaining.

68.    Upon receipt of this approval, and consistent with MSU's established policies, practices and past course of dealing with Coach Kubicka over her 33-year tenure, Coach Kubicka had a reasonable expectation of continued employment for the approved five-year term absent termination for cause following appropriate procedures. Vice-President Soufleris specifically stated in writing: "After reviewing the extensive self-appraisal materials offered by Anita, her supervisors' comments and my own interactions with Anita, I fully support her reappointment. Anita is a passionate coach and mentor within our Intercollegiate Athletics program. She gives 100% to her team and provided additional service in the area of compliance. Anita has been very helpful with the transition of the compliance area to a full-time compliance officer, and taken on other responsibilities within the department. I look forward to working with her during this year and beyond. We appreciate her dedication to Athletics and her team!" This unequivocal written approval, combined with MSU's established reappointment procedures and Coach Kubicka's 33-year history of continuous reappointment, created a mutually explicit understanding that Coach Kubicka would be reappointed for the 2024-2029 term.

69.    Despite Vice-President Soufleris's enthusiastic written approval of Coach Kubicka's five-year reappointment, defendant President Koppell failed and refused to execute or authorize the reappointment contract. Under NJSA 18A:60-14 and MSU's established procedures, President Koppell was required to either execute the approved reappointment or

notify Coach Kubicka of non-renewal "not later than 1 year prior to the expiration" of her existing contract. President Koppell did neither. Instead, upon information and belief, President Koppell withheld his signature from Coach Kubicka's approved reappointment while permitting defendants Hamilton and Vernon to suspend and investigate her based on unverified allegations, thereby using the investigation as a pretext to avoid honoring the reappointment that his own subordinates had approved. President Koppell's refusal to execute the approved reappointment, combined with his failure to provide the statutorily required notice of non-renewal, deprived Coach Kubicka of her vested property interest in that reappointment without due process of law.

**Pre-Deprivation Due Process Denied**

70.    Just 21 days after Vice-President Soufleris approved Coach Kubicka's reappointment, on April 13, 2023, without any prior notice of specific allegations, any identification of the complainants, any description or other notice of the alleged misconduct, any hearing or any opportunity to be heard, Coach Kubicka received a written "Notice of Suspension"—effective immediately—based on unidentified "recent allegations of misconduct in your role as Assistant Director/Head Coach of Softball within Montclair State University Athletics Department." Upon information and belief, President Koppell approved or ratified the decision to suspend Coach Kubicka notwithstanding the recent approval of her five-year reappointment. The Notice of Suspension stated that her suspension was "pending an investigation into the alleged misconduct" but provided no information about what specific conduct was being investigated, when the alleged conduct occurred, who had made the allegations, or what policies or standards Coach Kubicka had allegedly violated. The Notice of Suspension was signed by defendant Carly Hamilton, Assistant Vice-President of Montclair State for Employee and Labor Relations in the Division of Human Resources, with copies to defendant Vernon, Vice-President Soufleris and Mr. Chesney. At no time before, during or after

the suspension did defendants provide Coach Kubicka with specific notice of the allegations sufficient to enable her to prepare a meaningful response.

71.    Coach Kubicka's first notification of the non-renewal of her contract was at the conclusion of a September 6, 2023 meeting with MSU. Ms. Hamilton told her at that time, without any prior notice of the investigation's findings or opportunity to review or respond to them, that based on the findings of the investigation, [she would] not be renewed for a subsequent five-year appointment. Upon information and belief, President Koppell personally approved or ratified this non-renewal decision before it was communicated to Coach Kubicka.

72.    The September 6, 2023 meeting was not a hearing or a pre-decision opportunity to be heard; it was a notification of a decision that had already been made by defendants Koppell, Vernon and Hamilton. Coach Kubicka was not provided with a copy of the investigation report, was not informed of what specific findings had been made, was not told which of her alleged actions violated which policies or standards, and was not given any opportunity to respond to the findings before the non-renewal decision was made. Coach Kubicka was further informed that her employment would terminate on June 30, 2024, the expiration date of her then-current five-year contract. MSU subsequently set September 6, 2024 as the termination date, and Coach Kubicka's employment was purportedly terminated by non-renewal on that date. For the reasons set forth in Count Eleven, *infra*, this termination date violated NJSA 18A:60-14, which required notification "by the president" not later than one year before contract expiration.

**Post-Deprivation Due Process Denied**

73.    At no time after the September 6, 2023 notification of non-renewal did MSU offer Coach Kubicka any post-deprivation hearing, grievance procedure, appeal or other mechanism to challenge the non-renewal decision. Coach Kubicka was never provided an opportunity to review the investigation findings, respond to the specific allegations, present evidence or

witnesses in her defense, or appear before an impartial decision-maker. The State of New Jersey did not and does not provide adequate post-deprivation remedies for constitutional violations of this nature.

**Requests for Investigation Report Denied**

74.    Coach Kubicka, through her counsel, repeatedly requested a copy of the investigation report prepared by Saiber LLC so that she could understand and respond to the findings used to justify her termination. Defendants refused each request, and have continued deliberately to withhold the report to this day. This refusal to provide the investigation report made it impossible for Coach Kubicka to meaningfully challenge the findings or clear her name of the misconduct charges. Upon information and belief, defendants withheld the report because they knew it would reveal the investigative deficiencies, lack of factual substantiation and gender-biased methodology alleged throughout this Complaint.

**Stigmatizing Effect of Misconduct Findings**

75.    The misconduct findings made against Coach Kubicka—including allegations of physical and verbal abuse of athletes, creating a toxic environment and violating health and safety protocols—have stigmatized her within the collegiate athletics community. Since her termination, Coach Kubicka has been unable to secure a comparable position as a head softball coach at any collegiate institution. Upon information and belief, her applications have been rejected or not considered due to the unrefuted misconduct findings, which have effectively blacklisted her from her chosen profession after 33 years of award-winning coaching. The stigma attached to Coach Kubicka's termination constitutes a deprivation of her liberty interest in pursuing her profession, which cannot be remedied absent the opportunity to clear her name that defendants have refused to provide.

20

## I. EFFECTS OF GENDER STEREOTYPES AND SOCIALIZATION ON THE ALLEGATIONS AGAINST COACH KUBICKA

76. Despite Coach Kubicka's 33-year history of exemplary service, MSU used a series of allegations to justify her termination. Each allegation, when properly analyzed, reveals not actual misconduct but rather the harmful impact of gender stereotypes, socialization effects and the resulting double-bind faced by female coaches.

77. The following sections detail key allegations and demonstrate how gender stereotypes transformed ordinary coaching behaviors into perceived misconduct.

### A. The Concussion Protocol Allegation

78. One primary allegation against Coach Kubicka claimed that she violated concussion protocol with a female athlete (FC) who had suffered a concussion during practice.

79. On April 11, 2023, FC was permitted by the athletic training staff to travel with the team to Camden, New Jersey, while under concussion protocol. During the game, FC hit off a tee without authorization behind the dugout wall, out of Coach Kubicka's line of sight. Coach Kubicka was focused on game preparation and never instructed FC to engage in this activity.

80. The head athletic trainer, Tara Temple, sent Coach Kubicka an accusatory email stating: "Today 4/12/23 when she came into our facility stating that you had her complete physical activity at the game without our medical clearance."

81. Coach Kubicka's appropriate call to FC to understand what happened was later mischaracterized as "retaliation" against the athlete.

82. This incident demonstrates the operation of gender stereotypes in two critical ways:

    a. **The Double-Bind Bias**: Coach Kubicka was held to an impossible standard of oversight not required of male coaches, reflecting the stereotype that female

coaches should prioritize nurturing and protection over coaching responsibilities.

b. **Gender Socialization Bias**: Gender stereotypes led to an automatic assumption that Coach Kubicka must be at fault for FC's unauthorized activity, rather than holding the athlete accountable, reflecting societal biases that view young women as needing protection and female authority figures as responsible for preventing potential harm.

**B.  Physical Contact Allegations**

83.    Allegations claimed Coach Kubicka engaged in inappropriate physical contact with athletes, including pulling players, grabbing wrists, pushing players, throwing equipment and threatening physical violence. These allegations reflect the operation of gender stereotypes through:

a. **The Double-Bind Bias**: When male coaches make physical contact for instructional purposes, such actions are viewed as normal coaching behavior. When Coach Kubicka engaged in identical instructional contact, her actions were reinterpreted as inappropriate due to gender expectations that women should not be physically assertive.

b. **Gender Socialization Effects**: Female athletes, socialized to report emotional discomfort more readily, may interpret standard coaching contact differently based on coach gender. Physical demonstrations accepted from male coaches become "inappropriate" when coming from a female coach violating gender norms of physical assertiveness.

c. **Administrative Gender Bias**: Administrations interpret identical physical contact differently based on coach gender. A male coach's contact is presumed instructional, while a female coach's identical contact is presumed potentially abusive.

d. **Exaggerated Physical Threat Perception**: Allegations that Coach Kubicka threatened to "beat the shit out of them with a bat" or "wanted to ring her neck" represent hyperbolic interpretations of standard coaching expressions that, from male coaches, would be contextualized as harmless figurative language.

**C.  Verbal Communication Allegations**

84.    Allegations claimed Coach Kubicka used inappropriate verbal communication, including statements like "You have the worst arm," "You look like you never played softball in

22

your life," and "if you weren't mentally slow you'd actually be able to field a ground ball" and

"You need to be medicated."

85.    Coach Kubicka never made these statements. These allegations demonstrate

gender-based evaluation through:

      a.    **The Communication Double-Bind**: If Coach Kubicka communicated with traditional feminine gentleness, she would be viewed as an ineffective leader. When she used direct communication typical in coaching contexts, her statements were reinterpreted as harsh due to stereotypes that women should be nurturing rather than direct.

      b.    **Socialization Effects on Perception**: Female athletes, socialized to expect nurturing communication from women, experience standard coaching directness as unusually harsh from a female coach. Identical statements from a male coach would be interpreted as "demanding excellence" rather than "being mean."

      c.    **Selective Memory and Reporting**: Gender stereotypes influence which coaching statements athletes remember and report. Direct feedback from Coach Kubicka became memorable and reportable specifically because it violated gender expectations.

      d.    **Heightened Language Scrutiny**: Allegations about Coach Kubicka "often cursing" or being "negative all the time" demonstrate how identical coaching language faces different standards based on gender, with male coaches routinely using similar language without scrutiny.

### D.  Mental Health and Emotional Support Allegations

86.    Allegations regarding Coach Kubicka's handling of athletes' mental health

included claims she told crying players that "athletes don't have feelings," sent players into panic

attacks, and made inappropriate comments about medication status. These allegations

demonstrate gender stereotyping through:

      a.    **The Caretaking Double-Bind**: Coach Kubicka faced contradictory expectations regarding athlete wellbeing---expected to show feminine nurturing while maintaining performance standards. When she prioritized performance, this violated gender expectations that women should prioritize emotional comfort over standards.

23

b.  **Health Discussion Gender Norms**: Female athletes may initially share health information with a female coach but later feel uncomfortable if the coach addresses that information in a coaching context rather than a purely nurturing one.

c.  **Mental Toughness Mischaracterization**: When Coach Kubicka encouraged mental toughness---a standard coaching approach used by coaches of all genders---her methods were reinterpreted as insensitivity to mental health concerns solely because she violated gender expectations.

## II.  DISCRIMINATION BASED ON GENDER AND AGE

87.    Beyond discrimination based solely on gender, the evidence demonstrates that MSU's treatment of Coach Kubicka was significantly influenced by the intersection of her gender and age. At 60 years old with 33 years of coaching experience, Coach Kubicka faced unique compound stereotypes and biases that colored both the allegations against her and MSU's response to those allegations.

88.    The intersection of gender and age created unique compound stereotypes and biases that particularly disadvantaged Coach Kubicka in ways not experienced by younger female coaches, male coaches of any age, or coaches who embody only one of these protected characteristics.

89.    These stereotypes were manifested in several specific ways:

a.  **Heightened "Role Incongruity"**: As an older woman in a leadership position in athletics, Coach Kubicka simultaneously violated both gender norms (by holding an authoritative coaching position) and age norms (by continuing in an active, physically demanding profession typically associated with younger individuals).

b.  **"Inflexibility" Stereotype**: Coach Kubicka was stereotyped as rigidly set in her ways and unable to adapt to evolving coaching methods or athlete expectations---a stereotype not equally applied to older male coaches, who are instead viewed as "experienced" or "seasoned" with valuable traditional knowledge.

c.  **"Outdated Communication Style" Bias**: Coach Kubicka's direct communication style was characterized as "outdated" or "harsh," while

identical communication from older male coaches is viewed as "traditional" or "old school" in a positive, respected manner.

d. **"Maternal Figure" Expectations**: As an older female coach, Coach Kubicka faced increased expectations to serve as a maternal figure who prioritizes athletes' emotional comfort over performance development, a standard not applied to older male coaches.

e. **Generational Resistance**: Coach Kubicka experienced heightened resistance from younger female athletes to accepting authority and criticism compared to these athletes' acceptance of similar conduct from male coaches of any age.

90. The influence of these biases is evident in the language used in the complaints against Coach Kubicka, which contain numerous references that simultaneously invoke both age and gender stereotypes:

a. References to being "set in her ways" and "unwilling to adapt" reflect the stereotype that older women are rigid and inflexible, while similar persistence in methods by older male coaches is characterized as "principled" or "disciplined."

b. Characterizations of her coaching style as "old-fashioned" or "out of touch" reflect the stereotype that older women cannot effectively connect with younger generations, while older male coaches facing the same generational gap are often praised for their "traditional approach."

c. Expectations that she should be more "nurturing" or "understanding" reflect heightened maternal expectations placed on older female coaches that intensify with age, while older male coaches face decreasing expectations to provide emotional support.

91. This discrimination based on the intersection of gender and age contributed significantly to the misinterpretation of Coach Kubicka's coaching methods, the generation of stereotype-influenced complaints, and the University's decision to terminate her employment despite her 33-year history of successful coaching.

92. MSU's flawed investigation process amplified these biases in several specific ways:

a. **Failure to Screen for Age-Gender Stereotype Effects**: MSU's investigation methodology made no attempt to identify how the intersection of gender and

age stereotypes might influence athlete perceptions and reporting. Terms in athlete complaints like "old school," "stuck in her ways," and references to "outdated methods" reflect age-gender stereotypes that should have triggered heightened scrutiny of the allegations.

   b.   **Devaluation of Experience**: Coach Kubicka's 33 years of successful coaching experience was paradoxically transformed from an asset into evidence of "inflexibility" and "outdated methods"--- a transformation that does not occur for male coaches of similar age and tenure, whose experience is instead celebrated as valuable institutional knowledge.

   c.   **Differential Evaluation of Communication Style**: The characterization of Coach Kubicka's direct communication as "harsh" or "abusive" reflected the heightened scrutiny applied to older women's communication style, which faces stricter standards than communication from either younger women (expected to be "evolving") or older men (respected as "traditional").

   d.   **Generational Conflict Framing**: MSU's investigation uncritically accepted the framing of complaints as reflecting a generational conflict between a coach with "old-fashioned methods" and modern athletes, rather than recognizing how this framing itself reflects stereotypes about older women's alleged resistance to change.

93.   MSU's investigation failed to consider how these stereotypes might interact with gender socialization effects to produce complaints that reflected bias rather than actual misconduct. This failure is particularly egregious given that:

   a.   The available evidence showed that Coach Kubicka's coaching methods remained consistent throughout her career and were previously recognized as effective and appropriate by the University;

   b.   Male coaches of similar or greater age at MSU, including Rick Giancola, employ similar methods without generating stereotype-influenced complaints or facing administrative scrutiny; and

   c.   Research consistently shows that older women in leadership positions face unique "double jeopardy" bias effects not experienced by either younger women or men of any age.

94.   The intersection of age and gender discrimination was particularly damaging to Coach Kubicka because it created a no-win situation where her decades of experience---which should have been her greatest asset---were transformed into evidence of alleged inability to relate

26

to younger athletes, a transformation that does not occur for male coaches with similar experience.

### III.    THE GENERATION AND PERPETUATION OF UNFOUNDED ALLEGATIONS

95.    The sudden emergence of serious allegations against Coach Kubicka after 33 years of exemplary service demonstrates how gender stereotypes transform perceptions, rumor and hearsay claims into false "evidence." This transformation occurs through several well-documented social psychological processes:

    a.    **Stereotype Confirmation Bias**: Athletes disproportionately noticed and reported normal coaching behaviors when these behaviors confirmed existing stereotypes about assertive women, while overlooking identical behaviors from male coaches.

    b.    **Memory Reconstruction**: When athletes recalled coaching interactions through gender stereotypes, these biases literally reshaped their memories, creating exaggerated or fabricated recollections that felt authentic to the reporter.

    c.    **Narrative Contamination**: As team members discussed Coach Kubicka, individual perceptions became contaminated by the group narrative, leading athletes to "remember" incidents they never personally witnessed or to reinterpret past interactions.

    d.    **Confirmatory Groupthink**: Once a negative narrative developed, it created a self-reinforcing cycle where athletes shared examples confirming the narrative while dismissing contradictory positive experiences.

96.    These stereotypes transformed normal coaching into perceived misconduct through specific linguistic and cognitive mechanisms:

    a.    **Behavior Relabeling**: Standard coaching behaviors received emotionally charged labels when performed by Coach Kubicka:

- Coaching demonstrations became "grabbing" or "pulling"
- Raised voice became "screaming" or "yelling"
- Constructive criticism became "mental abuse"
- Performance standards became "controlling behavior"

b.   **Quote Fabrication Through Inference**: Athletes may never have heard Coach Kubicka use specific language (like calling someone "mentally slow"), but inferred that sentiment from normal coaching feedback. Over time, this inference transformed into a "direct quote" in memory---a phenomenon called confabulation.

c.   **Context Elimination**: Normal coaching actions, removed from their legitimate context (game situations, teaching moments), took on an exaggerated quality. For example, coaching contact to demonstrate proper technique became remembered as inappropriate "physical contact."

## IV.   MSU'S "INVESTIGATION" WAS FUNDAMENTALLY FLAWED

97.   MSU's investigation was fundamentally flawed, enabling and reinforcing gender stereotypes rather than identifying them. Despite MSU's claim that Saiber LLC interviewed 41 individuals during its investigation, creating an appearance of thoroughness and diligence, a critical examination reveals that this investigation created merely an illusion of procedural fairness.

98.   Most significantly, **at no point did MSU assert that its investigator actually reached any conclusions about whether the allegations against Coach Kubicka were true**. Despite interviewing 41 people, MSU:

a.   **Never established that allegations were substantiated**. MSU's Position Statement used phrases like "athletes reported," "athletes claimed," and "athletes attributed" but never transitioned to conclusive language such as "the investigation found," "the investigation confirmed," or "the investigator determined that these allegations were accurate."

b.   **Treated the mere existence of complaints as sufficient justification for termination**. MSU simply listed allegations as if they were established facts without indicating that they were ever verified, suggesting that the decision was based merely on the collection of complaints, not on verified findings of misconduct.

c.   **Failed to provide specific verification for any incidents**. The investigation relied on vague characterizations and labels such as "toxic," "crazy," "rude," "sarcastic," "passive-aggressive," and someone who "gets off on embarrassing people"---precisely the type of gender-biased language that research has shown is disproportionately applied to women in leadership positions.

d.    **Made no attempt to corroborate serious allegations**. Despite serious allegations including claims of "physical abuse" and creating a "toxic environment," there was no indication that the investigators took steps to verify these claims by asking for specific instances, identifying witnesses who could corroborate these incidents, or examining whether the alleged behaviors occurred in front of assistant coaches, other staff or spectators.

e.    **Provided no comparative context**. The investigation made no attempt to place Coach Kubicka's alleged behaviors in the context of normal coaching practices in collegiate athletics, failing to compare her coaching methods to those of male coaches at MSU, to examine whether male coaches use similar or harsher methods without consequence, or to consider how gender socialization affects athletes' perceptions of identical coaching behaviors.

99.    This pattern reveals that MSU's investigation was not actually an investigation in the proper sense---it was merely a collection of complaints. A genuine investigation would have sought to determine whether the allegations were true, not simply compile them. MSU's decision to terminate a 33-year veteran coach with an exceptional record based on unverified allegations indicates that gender bias influenced not only the athletes' perceptions but the entire investigative process.

100.    Additionally, MSU's investigation contained numerous critical procedural failures, each of which provides evidence of discrimination through the operation of gender stereotypes, evidence of pretext and evidence of negligence. These failures include:

a.    **Failure to Demand Specificity**: The investigation accepted vague characterizations without requiring essential specifics:

- When? Exact dates and times of alleged incidents
- Where? Specific locations where misconduct supposedly occurred
- Who else? Other witnesses who could corroborate the specific incident
- Exact words? Verbatim quotes rather than paraphrasing
- Context? What preceded and followed the alleged behavior

b.    **Failure to Cross-Reference with Neutral Observers**: The investigation failed to systematically cross-reference allegations with observations from neutral parties regularly present at practices and games:

- Assistant coaches
- Athletic trainers and medical staff

29

- Officials and referees
- Opposing coaches and players
- Parents and spectators

c.  **Failure to Apply Source Credibility Analysis**: The investigation failed to distinguish between:

- Firsthand observations versus secondhand reports
- Specific recollections versus general impressions
- Consistent accounts versus contradictory claims
- Independent reports versus influenced testimonies

d.  **Failure to Identify Investigative Red Flags**: Several aspects of the allegations should have triggered heightened scrutiny:

- Timing Anomalies: Sudden emergence of serious complaints after decades of successful coaching
- Vagueness Patterns: Consistent lack of specific details across multiple allegations
- Linguistic Red Flags: Use of identical phrasing across different testimonies, suggesting contamination
- Implausible Consistency: Claims that Coach Kubicka was uniformly negative, with no acknowledgment of positive interactions
- Contradictory Evidence: Contrast between allegations and Coach Kubicka's documented performance evaluations

101.    The investigation's critical flaws were not oversights but intentional, suggesting

MSU's deliberate avoidance of procedures that would expose gender bias:

a.  **Deliberate Failure to Probe for Stereotype Effects**: MSU was fully aware that the investigation failed to question witnesses in a manner sufficient to determine whether their perceptions were influenced by gender stereotypes. The University has access to expertise in both athletic administration and human resources that would have informed it about well-documented gender biases in coaching evaluation, yet the investigation deliberately avoided methodology that would identify or control for these biases.

b.  **Strategic Avoidance of Male Comparator Analysis**: MSU consciously avoided any evaluation of coaching methods used by male coaches, despite being aware that male coaches at the institution regularly employ coaching techniques similar to or more demanding than those used by Coach Kubicka. This strategic omission from the investigation suggests awareness that such comparison would reveal differential treatment.

c.  **Knowing Disregard for Gender Differences in Reporting**: MSU was fully aware that female athletes report concerns about their coaches at significantly

higher rates than male athletes, a phenomenon well-documented in collegiate athletics and known to athletic administrators. Yet MSU deliberately failed to account for this gender difference in reporting, which disadvantages female coaches who are excluded from coaching men.

d.   **Withholding the Investigation Report to Conceal Flaws**: Most tellingly, MSU refused to produce a copy of the investigation report to Coach Kubicka or her counsel. This withholding appears not coincidental but calculated; MSU knew that the report would confirm these investigative flaws. By withholding this document, MSU prevented Coach Kubicka from defending herself while simultaneously using the investigation's mere existence as a shield against discrimination claims.

102.   MSU's investigation fundamentally failed to distinguish among five distinct categories of information, treating all as equivalent "evidence" of misconduct:

a.   What athletes **actually observed** (direct evidence);

b.   What athletes **heard from others** (hearsay);

c.   What athletes **felt** about Coach Kubicka (emotional response);

d.   What athletes **inferred** about Coach Kubicka's intentions (mind-reading);

e.   What athletes **expected** from a female coach (gender-based expectations).

103.   Instead, all five categories were treated as equivalent "evidence" of misconduct, creating a fundamentally flawed foundation for employment action. This investigation exemplifies what social scientists call "stereotype confirmation"--- a process where allegations shaped by gender stereotypes are uncritically accepted precisely because they conform to those same stereotypes.

104.   Proper investigative procedures would have included:

a.   **Incident Specificity Requirements**: Documenting exact dates, times, locations, witnesses and verbatim language for each allegation.

b.   **Factual Verification Processes**: Cross-checking allegations against practice and game schedules, video recordings, statements from neutral observers and prior documentation.

c.   **Comparative Analysis**: Examining how male coaches' similar behaviors were perceived and characterized by athletes.

    d.      **Forensic Interviewing Techniques**: Using methods designed to distinguish between genuine recollection and confabulation, including open-ended questions, avoidance of leading questions and exploration of inconsistencies.

    e.      **Group Dynamics Analysis**: Investigating potential sources of narrative contamination, including timing of complaint emergence and communication patterns among complainants.

    f.      **Active Stereotype Awareness**: Screening for and controlling gender-based biases in evaluating behaviors.

105.    Coach Kubicka never coached in secret. MSU observed her practices and games over 33 years, yet she was terminated based on allegations from a handful of athletes that contradicted the University's extensive experience with her work and the observations of hundreds of others, including supervisors and professionals.

106.    What MSU claims to be "substantial evidence" against Coach Kubicka was actually stereotype confirmation masquerading as fact---a circular process where allegations shaped by gender stereotypes were uncritically accepted precisely because they conformed to those same stereotypes.

107.    MSU's failure to implement proper investigative procedures to counteract these known biases amounts to deliberate indifference to the discriminatory impact of gender stereotypes on female coaches, directly resulting in Coach Kubicka's unjustified termination after 33 years of exemplary service.

## V.    MSU TREATED MALE COMPARATORS MORE FAVORABLY

108.    Every male coach at MSU represents a valid comparator to Coach Kubicka, since he either: (i) coaches similarly without complaints or termination; (ii) coaches more aggressively without consequences; or (iii) receives administrative support rather than scrutiny when complaints arise.

109.    Male coaches are permitted to use the entire range of coaching methods without reprisal, including traditionally "masculine" traits---firm, direct, authoritarian---that are not evaluated based on feelings, relationships or likeability.  See Paragraphs 24-30, supra.

110.    These male coaches do not engage in inappropriate behavior, but rather their standard coaching practices (clear performance expectations, direct communication, and accountability measures) are interpreted differently when employed by female versus male coaches.

111.    Particularly telling are coaches who work with both men's and women's teams, who find that identical coaching behaviors elicit different responses based on athlete gender. Female athletes, due to socialization creating different expectations about women in authority, may interpret standard coaching behaviors differently from male athletes. However, MSU's response to these differential perceptions failed to account for gender socialization's role.

112.    Male coaches of women's teams receive greater latitude than female coaches of women's teams.  For example:

    a.    **Patrick Naughter** (women's soccer) employs direct criticism and demanding conditioning, yet receives consistent administrative support despite occasional complaints similar to those made against Coach Kubicka.

    b.    **Eduardo Stawinski** (women's volleyball) uses direct communication and performance-based feedback that are characterized as "passionate" rather than "negative," despite employing methods similar to those alleged against Coach Kubicka.

    c.    **Peter Tuohy** (women's cross country/track) implements physically demanding training and direct criticism that are interpreted as "motivational" rather than "targeting" or "disrespectful", despite mirroring behaviors for which Coach Kubicka was terminated.

113.    This differential treatment based on coach gender constitutes direct evidence of gender discrimination. Complaints against male coaches are addressed with the presumption of appropriate methodology and administrative support, while complaints against Coach Kubicka

--- despite her stellar coaching record over 33 years --- were presumed valid and resulted in immediate suspension, investigation and termination without notice of the accusations or adequate opportunity to respond.

## VI.    DISPARATE IMPACT OF MSU'S POLICIES AND PRACTICES

114.    Beyond intentional discrimination, MSU's seemingly neutral policies and practices have a disparate impact on female coaches, disproportionately harming them through the operation of gender socialization and stereotype effects.

115.    MSU has implemented and maintained several specific policies and practices that, while neutral on their face, disproportionately harm female coaches due to gender socialization and stereotyping effects:

a.    **Complaint-Driven Evaluation Policy**: MSU's policy of initiating investigations and making employment decisions based primarily on the existence and number of athlete complaints, rather than on objective evidence of coaching misconduct, has a disparate impact on female coaches. As detailed above, female athletes are socialized to report concerns at significantly higher rates than male athletes experiencing identical coaching behaviors, creating a system where coaches of female teams automatically face heightened scrutiny regardless of their actual coaching methods.

b.    **Flawed Investigation Methodology**: MSU's policy of conducting investigations that:

(i)    fail to require specific factual allegations, (ii) fail to corroborate claims with neutral witnesses,

(ii)    fail to distinguish between firsthand observations and impressions,

(iii)    fail to compare coaching methods to those used by male coaches, and

(iv)    fail to screen for stereotype effects has a disparate impact on female coaches, who are disproportionately subject to stereotype-influenced complaints.

c.    **Reactive Intervention Without Education**: MSU's policy of intervening based on athlete complaints without first educating athletes and administrators about gender-based reporting differences, the protection paradox and stereotype effects has a disparate impact on female coaches, who become

subject to an inequitable evaluation system not applied to their male counterparts.

116.    MSU's complaint-driven evaluation system creates a facially neutral policy that results in significantly adverse effects on female coaches and coaches of women's teams. By allowing the mere existence or volume of athlete complaints to trigger investigations and adverse employment actions without controlling for known gender-based reporting differences, MSU has implemented a system that systematically disadvantages female coaches through the following mechanisms:

   a.    **Automatic Disadvantage for Coaches of Female Teams**: Research consistently demonstrates that female athletes report concerns at significantly higher rates than male athletes experiencing identical coaching behaviors. By relying on raw complaint volume rather than validated coaching misconduct, MSU's system inherently subjects coaches of female teams to greater scrutiny and higher risk of adverse employment action regardless of their actual coaching methods.

   b.    **Compounded Disadvantage for Female Coaches of Female Teams**: Female coaches like Coach Kubicka face a double burden under this system. Not only do they coach female athletes who are socialized to report concerns more frequently, but their coaching behaviors are also more likely to be misinterpreted through gender stereotypes that expect women to prioritize relationship maintenance over performance development.

   c.    **Statistical Disparities in Employment Outcomes**: The disparate impact of this policy is evidenced by the statistical data showing widespread exclusion of women from coaching positions for men's teams and their limited representation in coaching women's teams, as detailed in the New Jersey public university employment data.

117.    MSU's standardized investigation methodology, while appearing neutral, creates disparate impact through:

   a.    **Failure to Control for Stereotype Effects**: By accepting uncorroborated allegations without screening for gender stereotype effects, MSU's investigation protocols allow gender bias to determine outcomes while maintaining an appearance of neutrality,

   b.    **Treatment of All Complaints as Equivalent**: MSU's policy of treating all categories of information---direct observations, hearsay, emotional responses,

inferences, and gender-based expectations---as equivalent "evidence" of misconduct has a disparate impact on female coaches, whose normal behaviors are more likely to be subject to stereotype-driven misinterpretation.

c.   **Failure to Require Comparative Analysis**: By not requiring investigators to compare alleged misconduct to similar behaviors by male coaches, MSU's methodology systematically disadvantages female coaches whose identical behaviors are interpreted differently due solely to gender.

118.   These policies are not justified by business necessity, since MSU could achieve its legitimate interests through readily available alternative policies with less discriminatory impact:

a.   **Multi-Method Assessment Approaches**: Instead of relying on complaint volume, MSU could implement comprehensive coaching evaluation systems that incorporate multiple performance data sources including performance metrics, structured observations, and feedback from diverse stakeholders.

b.   **Enhanced Investigation Protocols**: MSU could adopt investigation procedures that require incident specificity, factual verification, corroboration from neutral observers, and comparative analysis to male coaching behaviors.

c.   **Education on Gender Socialization Effects**: MSU could implement education programs for athletes and administrators on gender-based reporting differences, stereotype awareness, and the protection paradox.

119.   MSU's failure to implement these reasonable alternatives, despite its legal obligation to prevent discrimination, demonstrates deliberate indifference to the disparate impact of its facially neutral policies on female coaches.

## VII.   PATTERN AND PRACTICE OF DISCRIMINATION EXTENDING THROUGHOUT MSU

120.   Plaintiff alleges that Montclair State University has engaged in a pattern and practice of systemic gender discrimination that extends beyond her individual case to affect female coaches throughout the University's athletic department.

121.   This pattern and practice of discrimination is evidenced by:

a.   The systematic exclusion of female coaches from men's teams at MSU and throughout New Jersey's public universities, as demonstrated by the statistical

36

data presented above showing that only 7.7% of head coaches for men's teams across New Jersey's public universities are women, with many institutions (including MSU for head coaching positions) employing **no** women to coach men's teams;

b.    The consistent application of different standards to evaluate female coaches compared to male coaches, as demonstrated by the treatment of Coach Kubicka as compared to Rick Giancola, Justin Potts, Dave Lorber and Ian Carter;

c.    The recurring implementation of flawed investigation procedures that fail to screen for gender stereotype effects, as demonstrated in Coach Kubicka's case and reflected in the systemic pattern of discipline of female coaches;

d.    The University's deliberate indifference to the known effects of gender socialization on athlete reporting behaviors, creating a system where coaches of female teams face heightened scrutiny regardless of their actual coaching methods; and

e.    The University's failure to implement policies to mitigate the known effects of gender stereotypes despite its legal obligation to do so under Title VII and Title IX.

122.    This pattern and practice is not limited to individual decision-makers, but instead represents the standard operating procedure throughout MSU's athletic department and administration, creating a system where discrimination has become the rule rather than the exception.

123.    This systemic discrimination is evidenced by:

a.    **Widespread Statistical Disparities**: The complete exclusion of women from head coaching positions for men's teams at MSU and their limited representation (only two of 33) as assistant coaches for men's teams cannot be explained by random chance or individual hiring decisions, but rather reflects a standard operating procedure of gender segregation in coaching assignments.

b.    **Consistent Double Standards in Evaluation**: The differential treatment of Coach Kubicka compared to male coaches like Rick Giancola, Justin Potts, Dave Lorber and Ian Carter demonstrates that MSU regularly applies different standards to female coaches based solely on gender, allowing male coaches to use coaching methods identical to or more demanding than those that resulted in Coach Kubicka's termination.

37

c.  **Institutional Policy Failures**: MSU's systematic failure to implement proper procedures for investigating complaints against coaches, combined with its deliberate avoidance of documentation that would reveal gender bias, indicates that avoiding the detection of discrimination is standard operating procedure rather than an isolated oversight.

d.  **Administrative Awareness and Inaction**: MSU administrators, including those responsible for Coach Kubicka's termination, were fully aware of the risks of gender stereotyping in athletics yet deliberately failed to implement controls for these known biases; this indicates that permitting gender bias to influence employment decisions is an accepted practice throughout the MSU athletic administration.

e.  **Participation in Industry-Wide Segregation**: MSU's participation in the widespread practice of gender segregation in coaching positions, mirroring the pattern across all New Jersey public universities, demonstrates that its discriminatory practices are not aberrations but rather reflect institutional policy.

124.    This pattern and practice of discrimination permeates MSU's operations, creating a system where female coaches:

a.  Are systematically excluded from coaching men regardless of qualifications;

b.  Face heightened scrutiny and different standards when coaching women;

c.  Are required to perform additional labor to navigate gender expectations not required of male counterparts;

d.  Are subjected to flawed investigation processes that enable rather than control for stereotype effects; and

e.  Are terminated based on unverified athlete complaints influenced by gender bias.

125.    The consistency and pervasiveness of these discriminatory practices demonstrate that gender bias is not the result of isolated decisions by individual actors, but instead represents MSU's standard operating procedure when evaluating and making employment decisions about female coaches.

## VIII. FAILURE TO DOCUMENT AND PRESERVE EVIDENCE OF DISCRIMINATORY TREATMENT

126.    In addition to the direct discriminatory conduct, flawed investigation and disparate impact described above, upon information and belief Montclair State University systematically has failed to create, maintain and preserve documentation that would expose the operation of gender stereotypes and the resulting double standards applied to female coaches, despite having clear obligations to do so.

127.    Upon information and belief, Montclair State University has failed to document or maintain records of the additional work burden imposed on female coaches, including Coach Kubicka, as a result of the double bind that requires female coaches to constantly navigate between exhibiting the "masculine" leadership traits necessary for effective coaching while simultaneously meeting gendered expectations for "feminine" behavior.

128.    This additional work burden represents a form of gender-based discrimination wherein female coaches are required to engage in significant additional labor compared to their male counterparts, who face no equivalent pressure to modulate their coaching styles to conform to contradictory gender expectations.

129.    Upon information and belief, Montclair State University has failed to document or analyze differential reporting patterns between male and female athletes, despite substantial research showing that female athletes report concerns at significantly higher rates than male athletes experiencing identical coaching behaviors. This documentation would have contextualized the complaints against Coach Kubicka as consistent with predictable gender-based reporting differences rather than evidence of problematic coaching.

130.    Upon information and belief, MSU did not maintain data or documentation comparing male and female student-athlete responses to similar coaching methods, which would

39

have revealed that complaints were driven by gender socialization and expectations rather than actual misconduct. This failure to document these differential response patterns allowed stereotypes to drive employment decisions unchecked.

131.    Upon information and belief, Montclair State University deliberately avoided collecting or analyzing documentation that would reveal the disparate impact of its practices on female coaches, including:

      a.    Transfer rates, academic performance and mental health service utilization by athletes on teams coached by males compared to females, which would have revealed that male athletes experience similar or greater coaching stress but respond differently due to gender socialization;

      b.    Comparative analysis of complaint frequencies between male and female athletes experiencing similar coaching methods, which would have exposed the protection paradox whereby female athletes report concerns at significantly higher rates due to gendered help-seeking behaviors rather than actual differences in coaching quality;

      c.    Documentation of specific verbal and physical coaching techniques used by male coaches including Rick Giancola (Football), Justin Potts (Men's Basketball), Dave Lorber (Baseball), and Ian Carter (Track and Field), all of whom employ coaching techniques similar to or more intense than those for which Coach Kubicka was terminated;

      d.    Workload comparisons documenting the additional labor, including managing athlete feelings and navigating gender expectations, required of female coaches but not male coaches.

132.    Even more egregiously, upon information and belief Montclair State University failed to preserve relevant documentation after being placed on notice of Coach Kubicka's claims.  As of December 10, 2024, despite plaintiff's specific request that it do so, the University had failed to issue appropriate preservation notices to its personnel, including coaches, administrators, and staff members who possessed relevant information.

133.    Montclair State University was placed on notice of potential legal claims through:

a.    The initial complaints of gender discrimination made by Coach Kubicka during her employment;

40

     b.     A letter from Coach Kubicka's counsel dated May 17, 2024, which further detailed her claims;

     c.     The EEOC complaint filed by Coach Kubicka;

     d.     A letter to the University dated November 2, 2024, explicitly notifying the University of Coach Kubicka's claims.

134.    Despite these multiple notices, upon information and belief Montclair State University failed to issue appropriate preservation notices to employees in possession of relevant evidence. Coach Kubicka herself never received a preservation notice from the University despite remaining an employee through September 6, 2024.

135.    Furthermore, on December 10, 2024, Coach Kubicka's counsel sent a formal, detailed preservation notice to defendant's counsel, Monica C. Barrett, Esquire, explicitly identifying specific categories of documents requiring preservation. This comprehensive four-page notice, titled "Notice To Preserve Documents/Data to Expose Operation of Gender Stereotypes," detailed eleven specific categories of documents and data that required preservation.

136.    This formal preservation notice explicitly identified documents that would have further exposed:

     a.     The double standards applied to female coaches;

     b.     The added work burden placed on female coaches due to gender stereotypes;

     c.     Montclair State University's participation in illegal gender segregation in coaching; and

     d.     The differential treatment of male and female athletes experiencing similar or more demanding coaching methods.

137.    Coach Kubicka and her counsel received no response from MSU. There has been no indication that the preservation notices requested in the letter to MSU's counsel were ever issued, or that any steps were taken to preserve the identified documents and data.

138.    The University's apparent failure to preserve critical documentation has resulted in the potential spoliation of evidence that would have further demonstrated the differential treatment of female coaches based on gender stereotypes, gender socialization effects and the resulting double standards applied to Coach Kubicka.

139.    The deliberate failure to document and preserve evidence of discriminatory treatment is itself evidence of the University's awareness of its discriminatory practices and its effort to conceal these practices from scrutiny.

140.    The categories of documents that should have been preserved, but apparently were not, include:

    a.    Student-athlete experience records showing differential reporting patterns based on athlete gender;

    b.    Hiring and employment practices documentation for all coaching positions demonstrating the University's participation in illegal gender segregation;

    c.    Performance evaluation records showing how identical coaching behaviors are evaluated differently based on coach gender;

    d.    Disciplinary and termination records demonstrating disparate treatment of male and female coaches;

    e.    Coaching practices documentation, including practice and game footage, that would reveal similar or more demanding coaching techniques used by male coaches without consequence;

    f.    Workload documentation revealing the additional work burden placed on female coaches due to gender stereotypes and socialization effects.

141.    Upon information and belief, Montclair State University's failure to create, maintain and preserve this documentation represents an attempt to shield its discriminatory practices from exposure and legal scrutiny, and this failure has directly harmed Coach Kubicka by making it more difficult to demonstrate the full extent of the discriminatory treatment she experienced.

142.    In the event that MSU has in fact failed to preserve the documents and data specifically identified in the December 10, 2024 preservation notice, MSU has engaged in spoliation of evidence. This spoliation provides further evidence of intentional discrimination and pretext, supporting Coach Kubicka's claims.

143.    The deliberate failure to preserve evidence after receiving multiple notices, including a detailed preservation notice specifically identifying relevant categories of documentation, demonstrates conscious disregard for legal obligations and suggests an effort to conceal evidence of discriminatory practices.

144.    As a result of gender segregation, stereotyping and discriminatory actions in violation of state and federal law, plaintiff has suffered substantial damages, including emotional distress, lost income and career damage. Since her termination, her efforts to secure college coaching positions have been hampered by the discriminatory termination, effectively placing a "scarlet letter" on her resume that requires strong equitable relief to remedy.

## IX.    CLASS REPRESENTATION AND COMMONALITY

145.    Plaintiff brings Counts 1, 2, 3, 4, 5 and 6 of this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), on behalf of herself and all current and former female coaches employed by Montclair State University within the applicable statute of limitations period who have been subjected to discrimination based on segregation, gender stereotypes, the protection paradox and gender socialization effects (the "MSU Class").

146.    The proposed class is so numerous that joinder of all members is impracticable. Based on the data presented above, the MSU Class includes approximately six current female head coaches and 17 female assistant coaches, plus and an additional 20-30 former coaches within the limitations period.

147.    There are questions of law or fact common to the MSU Class.

148.    Plaintiff's gender discrimination claims are typical of the claims of the members of the MSU Class because she has experienced the same discriminatory practices that affect all class members, including gender segregation, stereotype-driven evaluation, and disparate standards compared to male coaches.

149.    Plaintiff will fairly and adequately protect the interests of the MSU Class. She is an appropriate class representative for all female coaches at MSU, all of whom who face the same barriers, double standards and heightened scrutiny due to gender stereotypes and socialization effects as she did.

150.    She has retained counsel experienced in complex employment discrimination and class action litigation, and her interests are aligned with those of the class.

151.    MSU has acted or refused to act on grounds generally applicable to the MSU Class, in that MSU's policies and practices with regard to female coaches apply generally to the MSU Class, so that final injunctive relief and corresponding declaratory relief prohibiting those policies and practices will benefit the MSU Class as a whole.

152.    The systemic nature of these discriminatory practices requires class-wide injunctive relief to remedy the harm to all affected female coaches at MSU and to prevent future discrimination against the MSU Class.

**COUNT ONE**
**Violation of Title VII— MSU**
**(Gender Discrimination and Hostile Work Environment)**

153.    Plaintiff repeats and realleges paragraphs 1-152 as if fully set forth herein.

154.    Anita Kubicka has satisfied all administrative requirements and conditions precedent for bringing suit under Title VII on this claim.

155.    Under the provisions of Title VII, it is unlawful for an employer to discriminate against an employee on the basis of sex.

156.    At all relevant times, defendant was an "employer" within the meaning of Title VII.

157.    MSU's conduct against Anita Kubicka and the MSU Class was discriminatory because it failed to treat them equally with male coaches, allowed their supervisors to discriminate against them, subjected them to different and heightened scrutiny at work, and held them to different and higher standards, all in violation of Title VII.

158.    MSU discriminated against Coach Kubicka and the MSU Class on the basis of gender in violation of Title VII by holding them to a different standard than similarly-situated men in the terms and conditions of their employment, including terminating Coach Kubicka from her position based on the operation of gender stereotypes, the protection paradox and gender-based perception bias.

159.    MSU's discrimination against Coach Kubicka was further evidenced by its fundamentally-flawed investigation that created merely an illusion of procedural fairness, while actually enabling and reinforcing gender stereotypes. Despite allegedly interviewing 41 individuals, MSU never established or concluded that any allegation against Coach Kubicka was substantiated, treated the mere existence of complaints as sufficient justification for termination without verification, and failed to provide specific corroboration for any incidents. This pattern reveals that MSU's investigation was not actually an investigation in the proper sense---it was merely a collection of complaints designed to create the appearance of thoroughness while allowing gender bias to determine Coach Kubicka's fate.

45

160.    MSU required Coach Kubicka, and all female coaches at the University, to work within a segregated system that requires them to perform additional labor not required of male counterparts. This additional labor includes managing the feelings of their athletes more carefully, navigating the double bind between feminine and masculine coaching methods, and contending with gender-based reporting differences. These expectations are not required of male coaches.

161.    MSU's discriminatory conduct was further evidenced by the "protection paradox" in its response to athlete complaints. Defendants misinterpreted higher rates of reporting from female athletes (a product of gender socialization) as evidence of problematic coaching, rather than recognizing predictable gender-based reporting differences. Defendants simultaneously triggered protective responses based on female athletes' complaints without critically evaluating the credibility of their specific claims, creating an inequitable evaluation system that particularly disadvantaged Coach Kubicka and the MSU Class.

162.    In so violating Title VII, defendants acted with malice or with reckless indifference to the Title VII rights of Coach Kubicka and the MSU Class.

163.    As a result of defendants' conduct, Coach Kubicka suffered loss of employment, loss of wages and benefits, loss of compensation in lieu of personal time off, emotional pain and suffering, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career and out-of-pocket expenses, for which she is entitled to compensatory and punitive damages.

164.    Defendants' actions also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII, including reinstatement, front pay, back pay, training, oversight of the athletic department and Montclair State University

46

generally to ensure gender equality throughout the University, and such other and further relief as the Court deems appropriate.

## COUNT TWO
### Violation of Title IX— MSU
### (Gender Discrimination and Hostile Work Environment)

165.    Plaintiff repeats and realleges paragraphs 1-164 as if fully set forth herein.

166.    Defendants' educational programs and activities receive federal financial assistance within the meaning of Title IX.

167.    Title IX regulations require defendants to take such remedial action as is necessary to overcome the effects of sex discrimination in violation of Title IX.

168.    Defendants violated the rights of Anita Kubicka and the MSU Class by maintaining a segregated system, requiring additional work of her and other females to manage the expectations of their teams, maintaining a hostile work environment, and later firing her because of her gender or based on gender-stereotyped evaluations by athletes and third parties.

169.    Defendants' violation was further compounded by their fundamentally flawed investigation process that was deliberately designed to avoid uncovering gender bias. This investigation's critical flaws were not mere oversights, but rather intentional and systematic, including deliberate failure to probe for stereotype effects, strategic avoidance of male comparator analysis, knowing disregard for gender differences in reporting, and withholding the investigation report to conceal flaws. By creating the appearance of thoroughness through a 41-complaint investigation while in fact merely collecting complaints without verification, defendants engaged in an intentional process that allowed gender stereotypes to determine Coach Kubicka's fate.

170.    Defendants' violation was further compounded by their failure to recognize and address the social psychological processes through which unfounded allegations emerge, including stereotype confirmation bias, memory reconstruction, narrative contamination and confirmatory groupthink. These processes transformed Coach Kubicka's ordinary coaching behaviors into perceived misconduct solely because they were exhibited by a female coach.

171.    Defendants breached their Title IX duty by failing to implement proper investigative procedures that would have identified and mitigated the operation of gender stereotypes. These failures included accepting vague characterizations without demanding specificity, failing to cross-reference allegations with neutral observers, failing to apply source credibility analysis, and failing to identify investigative red flags.

172.    As a proximate result of defendants' actions, plaintiff has suffered and will suffer injury and damage as set forth above.

173.    Defendants acted with malice or with reckless indifference to Coach Kubicka's federally-protected rights.

### COUNT THREE
**Violation of Title VII—MSU**
**(Illegal Segregation and Limitation on the Hiring and Retention of Women)**

174.    Plaintiff repeats and realleges paragraphs 1-173 as if fully set forth herein.

175.    Title VII makes it illegal to segregate or limit the recruiting, hiring or opportunities for women in any job category.

176.    Defendants have engaged in unlawful segregation by precluding the hiring of women to coach men and limiting the opportunities of women to coach other women.

177.    Defendants' practice of illegal segregation continues to this day, since Montclair State University does not and never has employed a woman to coach men, and yet fully supports and hires men to coach women.

178.    Coach Kubicka has been harmed by the fact of working in a segregated system. The segregation perpetuates stereotyped masculine and feminine coaching traits that create added work, pressure and the need to walk a narrow path that are not required of men.

179.    The fact that Coach Kubicka has not applied to coach men is a product of the patterns of discrimination affecting her and all women, and is a direct result of de facto segregation that discourages females from even thinking of seeking a coaching position for male teams.

180.    Even if Coach Kubicka cannot personally recover damages from the direct segregation of women from coaching men, the effect of defendants' practice of illegal segregation is to encourage and continue stereotypes on the part of every person participating in Montclair State University athletics.

181.    Defendants' practice of illegal segregation is proof of the underlying claims of discrimination (Counts I and II), and is further evidence that defendants have knowledge of the extreme risk of gender stereotypes affecting women in college athletics and of the need to exercise due care in the response to complaints about a female coach.

182.    Defendants' continued practice of enforcing illegal segregation is evidence of discrimination per se under Title VII (Count I) and Title IX (Count II), and of negligence per se (Count IV).

183.    Defendants acted with malice or with reckless indifference to Coach Kubicka's federally-protected rights of Coach Kubicka.

**COUNT FOUR**
**Violation of Title VII—MSU**
**(Negligent Discrimination)**

184.    Plaintiff repeats and realleges paragraphs 1-183 as if fully set forth herein.

185.    Defendants have a duty imposed by Title VII and additional duties under Title IX to avoid the foreseeable risks of gender stereotyping.

186.    Defendants have knowledge of these risks through their own policies and training.

187.    Defendants had specific knowledge of the risks to Coach Kubicka from their openly-stated stereotypes about female coaches.

188.    Defendants also participate in de facto segregation of women and, upon information and belief, have made no efforts to recruit or hire women to coach men.

189.    By the conduct alleged herein, defendants breached their duty of care to prevent and avoid discrimination against Coach Kubicka and all other women similarly situated, in violation of Title VII.

190.    As a proximate result of defendants' actions, Coach Kubicka has suffered and will continue to suffer injuries and damages as set forth herein.

191.    Defendants acted with malice or with reckless indifference to Coach Kubicka's federally-protected rights.

**COUNT FIVE**
**Title VII—MSU**
**(Disparate Impact Discrimination)**

192.    Plaintiff repeats and realleges paragraphs 1-191 as if fully set forth herein.

193.    Title VII prohibits not only intentional discrimination, but also facially neutral policies and practices that have a disproportionately adverse effect on individuals based on gender, regardless of intent. 42 U.S.C. § 2000e-2(k).

194.    Defendants have implemented and maintained several facially neutral policies and practices that have a disparate impact on female coaches and coaches of female teams:

    a.    **Complaint-Driven Evaluation Policy**: Defendants' policy of initiating investigations and making employment decisions based primarily on the existence and number of athlete complaints, rather than on objectively verified coaching misconduct, has a disparate impact on female coaches. As documented throughout this Complaint, female athletes are socialized to report concerns at significantly higher rates than male athletes experiencing identical coaching behaviors. This gender-based reporting difference creates a system where coaches of female teams automatically face heightened scrutiny regardless of their actual coaching methods.

    b.    **Flawed Investigation Methodology**: Defendants' investigation policy that:

      (i)    fails to require specific factual allegations,

      (ii)    fails to corroborate claims with neutral witnesses,

      (iii)    fails to distinguish between firsthand observations and impressions,

      (iv)    fails to compare coaching methods to those used by male coaches, and

      (v)    fails to screen for stereotype effects has a disparate impact on female coaches, who are disproportionately subject to stereotype-influenced complaints.

    c.    **Reactive Intervention Without Education**: Defendants' policy of immediately suspending coaches based on athlete complaints without first educating athletes and administrators about gender-based reporting differences, the protection paradox, and stereotype effects has a disparate impact on female coaches, who become subject to an inequitable evaluation system not applied to their male counterparts.

195.    The disparate impact of these policies is evidenced by the statistical disparities in employment outcomes for female coaches at MSU and throughout New Jersey's public university system, as demonstrated by:

    a.    The complete exclusion of women from head coaching positions for men's teams at MSU and their minimal representation (only two out of 33) as assistant coaches for men's teams;

    b.    The systemic pattern across all New Jersey public universities, where only 7.7% of head coaches for men's teams are women, with many institutions employing zero women to coach men's teams; and

c.   The disproportionate scrutiny and adverse employment actions against female coaches of women's teams compared to male coaches employing identical or more demanding coaching methods.

196.   These statistical disparities are statistically significant and cannot be explained by chance or neutral factors, but instead are the direct result of defendants' facially neutral policies interacting with gender socialization and stereotype effects to create a discriminatory impact.

197.   Defendants' policies and practices causing this disparate impact are not job-related for the position in question and consistent with business necessity. Even if defendants could establish business necessity, less discriminatory alternatives are readily available, including:

a.   Multi-method assessment approaches that do not rely primarily on self-reported concerns;

b.   Standardized investigation protocols that require specificity, corroboration, and comparative analysis;

c.   Athletic department training on gender socialization effects and stereotype awareness; and

d.   Equitable coaching evaluation systems that control for known gender differences in reporting behaviors.

198.   Defendants have failed to adopt these less discriminatory alternatives despite their availability and effectiveness, demonstrating deliberate indifference to the disparate impact of their policies on female coaches.

199.   As a direct and proximate result of the disparate impact on female coaches of defendants' facially neutral policies and practices, Coach Kubicka has suffered damages including loss of employment, loss of income, damage to her professional reputation, and emotional distress.

52

## COUNT SIX
### Title VII and ADEA—MSU
### (Discrimination based on gender and age)

200.    Plaintiff repeats and realleges paragraphs 1-199 as if fully set forth herein.

201.    Title VII prohibits discrimination on the basis of sex, and the Age Discrimination in Employment Act (ADEA) prohibits discrimination on the basis of age against individuals who are 40 years of age or older. These protections extend to discrimination based on the intersection of protected characteristics, where prejudice based on multiple protected characteristics creates a unique form of discrimination.

202.    At the time of her termination, Coach Kubicka was a 60-year-old woman with 33 years of coaching experience at Montclair State University, placing her within the protected class for age discrimination.

203.    By the conduct alleged herein, defendants discriminated against Coach Kubicka based on her gender and age, creating a unique form of discrimination that subjected her to stereotypes, prejudice and heightened scrutiny not faced by younger female coaches, male coaches of any age, or coaches who embody only one of these protected characteristics.

204.    Coach Kubicka's age and gender were motivating factors in defendants' decision to terminate her employment, as evidenced by:

      a.    The timing of her termination after 33 years of successful coaching, just as she approached age 60;

      b.    The terminology used against her, including references to her being "old school," "stuck in her ways," and using "outdated methods"---phrases that invoke both age and gender stereotypes;

      c.    The selective crediting of student-athlete complaints that reflect age-gender stereotypes while dismissing Coach Kubicka's extensive experience and documented coaching success; and

      d.    The University's eagerness to replace Coach Kubicka despite her 33-year history of positive performance evaluations and competitive success.

205.    As a direct and proximate result of defendants' discrimination based on Coach Kubicka's gender and age, she has suffered damages including loss of employment, loss of income, damage to her professional reputation, and emotional distress.

206.    Defendants' discrimination was willful, wanton and in reckless disregard of Coach Kubicka's federally-protected rights.

207.    Coach Kubicka seeks all remedies available under Title VII, the ADEA and the NJLAD for this age/gender discrimination, including back pay, front pay, compensatory and punitive damages, attorneys' fees and costs.

208.    Coach Kubicka further seeks injunctive relief requiring defendants to implement policies and training specifically addressing discrimination against older female coaches, and to establish evaluation and investigation protocols that screen for age/gender stereotype effects.

### COUNT SEVEN
**42 U.S.C. § 1983 – Defendants Koppell, Vernon and Hamilton**
**(Deprivation of Property and Liberty without Due Process of Law)**

209.    Plaintiff repeats and realleges paragraphs 1-208 as if fully set forth herein.

**State Action and Color of Law**

210.    Defendant Montclair State University is a state institution established under New Jersey law and operating as an instrumentality of the State of New Jersey. Defendants Koppell, Vernon and Hamilton, at all times relevant hereto, acted under color of state law in their capacities as officials of MSU exercising authority granted to them by the State of New Jersey.

211.    Defendants Koppell, Vernon and Hamilton are sued in their individual capacities for damages based their personal participation in the deprivation of Coach Kubicka's constitutional rights as set forth herein.  They are sued in their official capacities solely to seek injunctive relief.

**Property Interest**

212.    Coach Kubicka possessed a constitutionally protected property interest in her continued employment at MSU. This property interest arose from multiple sources:

a.    **Written Approval of Reappointment**: MSU's written notification to Coach Kubicka on March 23, 2023, of its enthusiastic approval of her five-year reappointment for the term July 1, 2024 through June 30, 2029, created a mutually explicit understanding between MSU and Coach Kubicka that she would be reappointed for that five-year term. This written approval, signed by Vice-President Soufleris after review of Coach Kubicka's self-appraisal materials and her supervisor's recommendation, represented the final substantive approval in MSU's reappointment process, with only the ministerial act of presidential execution remaining. President Koppell's subsequent refusal to execute the approved reappointment, without providing notice or an opportunity to be heard, constituted a deprivation of Coach Kubicka's vested property interest.

b.    **Established Policies and Practices**: MSU's established policies, procedures and consistent past practices regarding reappointment of professional staff, under which employees who received written approval of reappointment were reappointed absent termination for cause following appropriate due process proceedings, created a legitimate claim of entitlement to continued employment.

c.    **Course of Dealing:** Coach Kubicka's 33-year history of continuous employment and successive reappointments at MSU, combined with MSU's pattern of reappointing her following each evaluation period, created a reasonable expectation of continued employment that constituted a property interest protected by the Fourteenth Amendment.

d.    **State Law Protections:** NJSA 18A:60-14 establishes procedural protections for professional staff at state colleges, including notice requirements for non-renewal, that create a property interest in continued employment protected by the Fourteenth Amendment.

213.    The Fourteenth Amendment to the United States Constitution prohibits state actors from depriving any person of property without due process of law.

**Liberty Interest**

214.    In addition to her property interest, Coach Kubicka possessed a constitutionally protected liberty interest in her professional reputation and her ability to pursue her chosen profession as a collegiate softball coach.

215.    Defendants Koppell, Vernon and Hamilton deprived Coach Kubicka of this liberty interest by publicly stigmatizing her in connection with her termination. Specifically:

      a.    Defendants based Coach Kubicka's suspension and non-renewal on findings of "misconduct" and determinations that her "conduct does not align with the standards and professional expectations of a Montclair State University employee."

      b.    These stigmatizing charges—which included allegations of physical abuse, verbal abuse, creating a toxic environment, and violating concussion protocols—were made in connection with Coach Kubicka's termination and have become known within the collegiate athletics community.

      c.    These stigmatizing charges are false, as alleged throughout this Complaint.

      d.    These stigmatizing charges have foreclosed Coach Kubicka's ability to obtain comparable employment as a collegiate softball coach, effectively placing a "scarlet letter" on her professional record that has prevented her from continuing in her chosen profession.

216.    Under the "stigma-plus" doctrine established by the Supreme Court, when a government employer makes stigmatizing charges against an employee in connection with termination, due process requires that the employee be afforded an opportunity to clear her name. Defendants Koppell, Vernon and Hamilton failed to provide Coach Kubicka with any such name-clearing hearing despite the stigmatizing nature of the charges against her, and despite her requests for information about the allegations and an opportunity to respond.

**Procedural Due Process Violations**

217.     Defendants Koppell, Vernon and Hamilton violated Coach Kubicka's procedural due process rights by depriving her of her property and liberty interests without constitutionally adequate process. At minimum, due process required that Coach Kubicka receive:

    a.     Timely written notice of the specific factual allegations against her;

    b.     Notice of the evidence supporting those allegations;

    c.     A copy of the investigation report and findings;

    d.     Identification of the specific policies, standards or expectations she allegedly violated;

    e.     A meaningful opportunity to respond to the allegations and evidence before the termination decision was made;

    f.     An opportunity to present witnesses and evidence in her defense;

    g.     A decision by an impartial decision-maker who had not prejudged the outcome; and

    h.     An opportunity to clear her name of the stigmatizing charges made against her.

218.     Defendants provided none of these procedural protections. Instead:

    a.     **No Pre-Suspension Due Process:** On April 13, 2023, defendant Hamilton suspended Coach Kubicka immediately without any prior notice of specific allegations, without identifying the complainants, without describing the alleged misconduct with any particularity, and without any hearing or opportunity to respond.

    b.     **No Due Process During Investigation:** Throughout the investigation conducted between April and September 2023, defendants never informed Coach Kubicka of the specific allegations being investigated, never provided her an opportunity to respond to specific charges, and never allowed her to present witnesses or evidence in her defense.

    c.     **No Pre-Decision Due Process:** Before making the non-renewal decision, defendants never provided Coach Kubicka with the investigation report or findings, never informed her of which specific allegations had been substantiated, never identified which policies or standards she allegedly violated, and never gave her a meaningful opportunity to respond before the decision was made.

      d.     **Decision Already Made**: The September 6, 2023 meeting at which defendant Hamilton informed Coach Kubicka of the non-renewal decision was not a hearing; it was a notification of a decision already made. As confirmed by MSU's November 27, 2023 email, the decision that Coach Kubicka "would not be reappointed for the 2024-2029 professional staff employment term had been made before the September 6 meeting.

      e.     **Deliberate Withholding of Evidence:** Defendants deliberately withheld the investigation report from Coach Kubicka and her counsel despite repeated requests, preventing her from understanding the basis for the decision against her and from mounting any meaningful defense. This deliberate withholding continued throughout the internal process and to the present day.

      f.     **No Post-Deprivation Due Process:** After the non-renewal decision, defendants offered Coach Kubicka no grievance procedure, appeal, or other mechanism to challenge the decision or to clear her name of the stigmatizing misconduct findings.

219.    The procedural protections required by due process before depriving a public employee of a property or liberty interest in employment were clearly established at the time of defendants' conduct. The Supreme Court held in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), that public employees with a property interest in continued employment are entitled to notice of the charges against them and an opportunity to respond before termination. The Third Circuit and other courts have consistently applied these principles to require pre-deprivation notice and hearing before adverse employment actions are taken based on alleged misconduct. Similarly, the right to a name-clearing hearing when stigmatizing charges are made in connection with termination has been clearly established since *Board of Regents v. Roth*, 408 U.S. 564 (1972), and *Paul v. Davis*, 425 U.S. 693 (1976).

220.    No reasonable official in defendants' positions could have believed that suspending and terminating a 33-year employee based on misconduct findings, without ever providing her notice of the specific allegations, a copy of the investigation report, or any opportunity to respond before the decision was made, complied with the requirements of due

process. Defendants Koppell, Vernon and Hamilton knew or should have known that their conduct violated Coach Kubicka's clearly-established constitutional rights.

**Personal Involvement of Defendant Koppell**

221.    Defendant Jonathan Koppell was personally involved in the deprivation of Coach Kubicka's constitutional rights through the following actions:

    a.    Koppell, as President of Montclair State University, bore statutory responsibility under NJSA 18A:60-14 for notifying Coach Kubicka of the renewal or non-renewal of her contract not later than one year prior to expiration;

    b.    Despite receiving Vice-President Soufleris's written approval of Coach Kubicka's five-year reappointment on March 23, 2023, Koppell personally failed and refused to execute or authorize the reappointment contract, thereby depriving Coach Kubicka of her vested property interest in the approved reappointment;

    c.    Upon information and belief, Koppell personally approved or ratified the decision to suspend Coach Kubicka on April 13, 2023, notwithstanding the recent approval of her five-year reappointment by his subordinates;

    d.    Upon information and belief, Koppell personally approved or ratified the decision not to renew Coach Kubicka's contract based on the investigation findings, without ensuring she had been afforded adequate due process;

    e.    Koppell failed to provide Coach Kubicka with the statutorily required notice of non-renewal "by the president" as mandated by NJSA 18A:60-14;

    f.    Upon information and belief, Koppell personally participated in or ratified the decision to withhold the investigation report from Coach Kubicka and her counsel;

    g.    Koppell established, maintained or ratified policies governing coach investigations that failed to screen for gender bias and that enabled gender stereotypes to influence employment decisions;

    h.    Koppell was aware of or deliberately indifferent to the gender-segregated coaching structure at MSU and the differential treatment of female coaches, yet failed to take corrective action; and

    i.    Koppell failed to ensure that Coach Kubicka received constitutionally adequate process before the termination decision was made, despite his ultimate authority over employment decisions for professional staff and his knowledge that serious misconduct charges were being used to justify

termination of a 33-year employee whose reappointment had been approved by his own subordinates.

**Personal Involvement of Defendant Hamilton**

222.    Defendant Carly Hamilton was personally involved in the deprivation of Coach

Kubicka's constitutional rights through the following actions:

  a.    Hamilton personally decided to suspend Coach Kubicka on April 13, 2023, without providing her any notice of specific allegations or an opportunity to respond;

  b.    Hamilton personally signed the April 13, 2023 suspension letter;

  c.    Hamilton personally directed and oversaw the investigation of Coach Kubicka;

  d.    Hamilton personally decided not to provide Coach Kubicka any notice of specific allegations during the investigation;

  e.    Hamilton personally decided to recommend non-renewal of Coach Kubicka's contract based on the investigation findings;

  f.    Hamilton personally informed Coach Kubicka on September 6, 2023 that her contract would not be renewed, without having first provided her notice of the findings or an opportunity to respond;

  g.    Hamilton personally participated in the decision to withhold the investigation report from Coach Kubicka; and

  h.    Hamilton failed to provide Coach Kubicka with any name-clearing hearing or post-deprivation process, despite knowing that stigmatizing charges had been made against her.

**Personal Involvement of Defendant Vernon**

223.    Defendant David L. Vernon was personally involved in the deprivation of Coach

Kubicka's constitutional rights through the following actions:

  a.    Vernon, as Vice President of Human Resources, exercised final decision-making authority over the termination of Coach Kubicka's employment;

  b.    Vernon personally reviewed and approved the decision not to renew Coach Kubicka's contract;

c.    Vernon personally decided to terminate Coach Kubicka's employment based on the investigation findings without ensuring she had been afforded adequate due process;

d.    Vernon personally signed the February 7, 2024 letter terminating Coach Kubicka's employment;

e.    On information and belief, Vernon personally participated in the decision to withhold the investigation report from Coach Kubicka and her counsel; and

f.    Vernon failed to ensure that Coach Kubicka received constitutionally adequate due process before the termination decision was made, despite his supervisory authority over employment decisions and knowledge that serious misconduct charges were being used to justify termination of a 33-year employee.

**Damages**

224.    As a direct and proximate result of the deprivation of Coach Kubicka's constitutional rights inflicted by defendants Koppell, Version and Hamilton, she has suffered and continues to suffer:

a.    Loss of employment and the salary and benefits she would have received through June 30, 2029 under the approved five-year reappointment;

b.    Loss of future earnings and career advancement opportunities as a collegiate coach due to the stigma of the unrefuted misconduct findings;

c.    Damage to her professional reputation throughout the collegiate athletics community;

d.    Emotional distress, humiliation, and mental anguish caused by the stigmatizing charges and the denial of any opportunity to clear her name;

e.    Loss of her professional identity and standing as a respected collegiate coach after 33 years of exemplary service; and

f.    Out-of-pocket expenses incurred in attempting to vindicate her rights.

225.    Defendants' conduct was malicious, intentional, and committed with reckless disregard of Coach Kubicka's clearly-established federal constitutional rights. Defendants Koppell, Vernon and Hamilton knew that Coach Kubicka had a property interest in the reappointment that had been approved in writing, knew that serious misconduct charges were

61

being leveled against her, knew that these charges would stigmatize her and damage her career, and deliberately chose to deny her any meaningful opportunity to know the charges, review the evidence or respond to the charges before defendants made the decision to terminate her employment. This conduct warrants an award of punitive damages to punish defendants and deter similar constitutional violations in the future.

226.    Coach Kubicka is entitled to compensatory damages for all injuries proximately caused by defendants' constitutional violations, punitive damages for defendants' malicious and reckless conduct, and such other relief as the Court deems just and appropriate.

227.    Pursuant to 42 U.S.C. § 1988, Coach Kubicka is entitled to recover reasonable attorneys' fees and the costs incurred in prosecuting this action.

## COUNT EIGHT
### New Jersey Civil Rights Act – NJSA 10:6-2(c) – All Defendants

228.    Plaintiff repeats and realleges paragraphs 1-227 as if fully set forth herein.

229.    By the conduct alleged in Count Seven, defendants Koppell, Vernon and Hamilton, acting under color of law, deprived Coach Kubicka, without due process of law, of her vested property interest in reappointment for a five-year term, and of her vested liberty interest in her professional reputation and her ability to pursue her chosen profession as a collegiate softball coach, in violation of Art. 1, par. 1 of the Constitution of the State of New Jersey, the Fourteenth Amendment to the Constitution of the United States, and NJSA 10:6-2(c).

230.    Coach Kubicka is entitled to compensatory damages for all injuries proximately caused by defendants' constitutional and statutory violations, punitive damages for defendants' malicious and reckless conduct, and such other relief as the Court deems just and appropriate.

231.     Coach Kubicka is entitled to compensatory damages for all injuries proximately caused by defendants' constitutional violations, punitive damages for defendants' malicious and reckless conduct, and such other relief as the Court deems just and appropriate.

## COUNT NINE
### New Jersey Law Against Discrimination – All Defendants
### (Gender Discrimination and Hostile Work Environment)

232.     Plaintiff repeats and realleges paragraphs 1-231 as if fully set forth herein.

233.     The New Jersey Law Against Discrimination (NJLAD) prohibits discrimination in employment based on sex.

234.     By the conduct alleged herein, defendants discriminated against Anita Kubicka, subjected her to a hostile work environment and terminated her employment on the basis of her sex in violation of the NJLAD.

### Individual Liability of Koppell, Vernon and Hamilton as "Employers"

235.     Defendants Koppell, Vernon and Hamilton are each individually liable under the NJLAD as "employers" within the meaning of NJSA 10:5-5(e), which defines "employer" to include "any person acting directly or indirectly in the interest of an employer."

236.     Defendant Koppell, as President of Montclair State University, acted directly and indirectly in the interest of MSU and exercised ultimate authority over employment decisions affecting Coach Kubicka, including the statutory responsibility to approve or deny reappointments and to notify professional staff of renewal or non-renewal decisions. Koppell personally refused to execute Coach Kubicka's approved reappointment, personally approved or ratified the decision to terminate her employment, and established or maintained the policies that enabled gender discrimination in coach evaluation. Koppell's authority over Coach Kubicka's employment renders him an "employer" subject to direct individual liability under the NJLAD.

237.    Defendant Vernon, as Vice President of Human Resources, acted directly and indirectly in the interest of MSU and exercised supervisory authority over employment decisions affecting Coach Kubicka, including final decision-making authority over the termination of her employment. Vernon personally reviewed and approved the decision to terminate Coach Kubicka, signed the termination letter, and exercised control over the investigation and disciplinary process. Vernon's authority to hire, fire, and make decisions affecting the terms and conditions of Coach Kubicka's employment renders him an "employer" subject to direct individual liability under the NJLAD.

238.    Defendant Hamilton, as Assistant Vice President for Employee and Labor Relations, acted directly and indirectly in the interest of MSU and exercised supervisory authority over employment decisions affecting Coach Kubicka, including authority over employee discipline and investigations. Hamilton personally decided to suspend Coach Kubicka, directed and oversaw the investigation, recommended non-renewal of Coach Kubicka's contract, and communicated the termination decision. Hamilton's authority over discipline and her direct role in the employment actions against Coach Kubicka render her an "employer" subject to direct individual liability under the NJLAD.

239.    By the conduct alleged herein, defendants Koppell, Vernon and Hamilton, acting as employers within the meaning of the NJLAD, discriminated against Coach Kubicka on the basis of her sex by subjecting her to a gender-biased investigation, relying on gender-stereotyped allegations to justify adverse employment action, applying different standards to her than to similarly-situated male coaches, and terminating her employment based on gender-based perception bias.

**Alternative Individual Liability for Aiding and Abetting**

240.    In the alternative, defendants Koppell, Vernon and Hamilton are each individually liable under NJSA 10:5-12(e) for aiding, abetting, and assisting MSU's discriminatory acts against Coach Kubicka.

241.    MSU, as the principal, committed wrongful acts that caused injury to Coach Kubicka, including gender discrimination, hostile work environment, and wrongful termination.

242.    Defendants Koppell, Vernon and Hamilton were generally aware of their roles as part of MSU's overall discriminatory treatment of Coach Kubicka at the time they provided assistance to that discrimination.

243.    Defendants Koppell, Vernon and Hamilton knowingly and substantially assisted MSU's discrimination against Coach Kubicka by:

a.    President Koppell's failure and refusal to execute the approved reappointment while permitting the gender-biased investigation and termination to proceed;

b.    Conducting and overseeing a fundamentally flawed investigation designed to enable rather than detect gender bias;

c.    Relying on gender-stereotyped complaints and characterizations to justify adverse employment action;

d.    Failing to implement procedures to screen for the known effects of gender stereotypes despite their knowledge of these risks;

e.    Suspending Coach Kubicka without due process based on unverified allegations;

f.    Making and implementing the decision to terminate Coach Kubicka's employment based on gender-biased findings;

g.    Withholding the investigation report to prevent Coach Kubicka from identifying and challenging the gender bias underlying her termination; and

h.    Refusing to provide Coach Kubicka with any opportunity to respond to the stereotyped allegations or clear her name.

244.    As a proximate result of defendants' actions, Coach Kubicka has suffered and will continue to suffer injury and damages as set forth herein.

245.    Defendants acted with deliberate indifference to and willful and wanton disregard of Anita Kubicka's rights.

246.    Coach Kubicka is entitled to compensatory damages for all injuries proximately caused by defendants' constitutional violations, punitive damages for defendants' malicious and reckless conduct, and such other relief as the Court deems just and appropriate.

**COUNT TEN**
**NJSA 18A:60-14 - Defendant Montclair State University**

247.    Plaintiff repeats and realleges paragraphs 1-246 as if fully set forth herein.

248.    Under NJSA 18A:60-14, professional staff at state colleges "must be notified by the president not later than 1 year prior to the expiration of such contracts of the renewal or nonrenewal of the contract." This statute imposes a personal duty on the President to provide timely notice of renewal or non-renewal decisions.

249.    Defendant Koppell, as President of Montclair State University, bore personal statutory responsibility for ensuring that Coach Kubicka received timely and proper notice of the renewal or non-renewal of her contract. President Koppell failed to discharge this statutory duty.

250.    The purported notification on September 6, 2023 of nonrenewal effective on June 30, 2024 was void *ab initio* because it did not comply with the statutory requirement that employees in Coach Kubicka's category "must be notified by the president not later than 1 year prior to the expiration of such contracts." President Koppell failed to provide this notification personally as required by statute.

251.    MSU's attempt to cure this illegality by extending the non-renewal date to September 6, 2024 and renaming it a "non-reappointment" fails as a matter of law, because the

66

resulting 67-day contract is far shorter than the "1-year term" that is the minimum appointment authorized by NJSA 18A:60-14.

252.    Even if Coach Kubicka were not entitled to the full five-year contract renewal (through June 30, 2029) that she was promised and was entitled to, the earliest permissible effective date for her termination would have been June 30, 2025 – the expiration date of the minimum one-year renewal term that began on July 1, 2024.

**COUNT ELEVEN**
**Deprivation of Retiree Benefits – Defendant Montclair State University**

253.    Plaintiff repeats and realleges paragraphs 1-252 as if fully set forth herein.

254.    Upon her retirement, which MSU made effective as of September 1, 2024, and despite repeated requests, MSU never provided to Coach Kubicka a reconciliation of the unused sick leave and personal time off that she accumulated during her 33-year career at MSU.

255.    As a retiree, Coach Kubicka was entitled to this information.

256.    As a retiree, Coach Kubicka was entitled to a payout of her accrued personal time off.

257.    Despite her repeated requests, MSU refused to pay Coach Kubicka her accrued unused personal time off, alleging that MSU was entitled to withhold this payment because of its claim of Coach Kubicka's "misconduct".

258.    Coach Kubicka is entitled to be paid these funds in the same manner as any other retiree.

**WHEREFORE**, Plaintiff Anita Kubicka requests judgment against defendants as follows:

a.      For damages in an amount that will fully and fairly compensate her for her injuries and losses, including but not limited to (1) lost wages and benefits, (2) compensatory damages for loss of employment, (3) emotional pain and

67

suffering, (4) indignity, humiliation and embarrassment, (5) damage to reputation, (6) loss of career, (7) accrued personal time off, and (8) out-of-pocket expenses;

b.      For reinstatement through June 30, 2029, or in the alternative for extension of her employment period through June 30, 2025 in accordance with NJSA 18A:60-14;

c.      For punitive damages;

d.      For all legal and equitable remedies available to Coach Kubicka under Title VII and Title IX, and under New Jersey law, including but not limited to:

(i)    A declaratory judgment that defendants' policies and practices violate federal and New Jersey law:

(ii)   A mandatory and prohibitory injunction requiring defendants to cease and desist from their violations of the federal and New Jersey rights of Coach Kubicka, and to adopt institutional reforms to implement a comprehensive plan to eliminate gender segregation in coaching positions and gender and age discrimination in coach hiring, retention, evaluation, and investigative procedures;

(iii)  A declaratory judgment that defendants Vernon and Hamilton violated Coach Kubicka's rights under the Due Process Clause of the Fourteenth Amendment by depriving her of her vested property and liberty interests without due process of law;

(iv)  An order directing defendants to provide Coach Kubicka with access to the investigation report and findings, and to provide her a name-clearing hearing at which she may respond to the stigmatizing charges made against her;

(v)   A declaratory judgment that defendant Koppell violated his statutory duty under NJSA 18A:60-14 to notify Coach Kubicka of the renewal or non-renewal of her contract not later than one year prior to expiration;

(vi)  A declaratory judgment that defendant Koppell's failure and refusal to execute Coach Kubicka's approved reappointment, combined with his failure to provide statutorily required notice of non-renewal, constituted a deprivation of Coach Kubicka's property interest without due process of law;

e.      For attorneys' fees, costs, and such other relief as to the Court shall seem just and proper.

Injunctive relief should require the University to implement a comprehensive plan to eliminate gender segregation in coaching positions. The requested injunctive relief should

include, but not be limited to, the following evidence-based components to address pipeline barriers and systemic discrimination:

    **a.**    **Comprehensive Assessment and Accountability System:**

        (i)    Conducting a thorough audit of current coaching demographics and hiring practices;

        (ii)    Establishing data collection systems to track progress;

        (iii)    Creating accountability measures with meaningful consequences for failure to meet diversity benchmarks; and

        (iv)    Implementing annual reporting requirements on progress toward eliminating segregation

    **b.**    **Formalized Entry Program Implementation:**

        (i)    Creating paid fellowship positions that provide female coaches experience with men's teams;

        (ii)    Reforming graduate assistant positions to include minimum requirements for diversity in men's programs;

        (iii)    Developing standardized interview protocols that reduce implicit bias in selection; and

        (iv)    Implementing blind first-round application reviews where gender and name are removed

    **c.**    **Career Development Infrastructure:**

        (i)    Establishing a cross-institutional mentorship network pairing aspiring female coaches with established coaches;

        (ii)    Providing technical certification and professional development opportunities specifically targeting female coaches;

        (iii)    Creating coaching exchange programs for brief immersion experiences; and

        (iv)    Developing leadership programs specifically designed to prepare women for head coaching positions

    d.    **Hiring Practice Reform**:

        (i)    Establishing minimum standards for diverse candidate pools for all coaching positions;

(ii)   Implementing diverse hiring committees with training on bias recognition;

(iii)   Creating policies requiring qualified female candidates to be interviewed for positions on men's teams; and

(iv)   Developing standardized, competency-focused interview protocols that minimize the impact of stereotypes

**e.**      **Compensation and Retention Reforms:**

(i)   Conducting equity audits of coaching compensation;

(ii)   Establishing transparency in contract terms;

(iii)   Creating retention incentives for female coaches, particularly in men's programs; and

(iv)   Implementing family-friendly policies including parental leave and childcare support

**f.**      **Culture Change and Visibility Initiatives:**

(i)   Creating media strategies highlighting female coaches in men's programs;

(ii)   Developing recognition programs for coaching excellence regardless of gender;

(iii)   Implementing educational programs for male student-athletes on working with female coaches; and

(iv)   Establishing feedback mechanisms for coaches that control for gender bias

**g.**      **Protection Paradox Mitigation:**

(i)   Implementing multi-method assessment approaches beyond self-reported concerns;

(ii)   Establishing gender-responsive support systems with multiple entry points;

(iii)   Providing education on gender biases in reporting and response; and

(iv)   Creating standardized response protocols for athlete concerns that ensure consistent evaluation regardless of athlete or coach gender

**h.**      **Investigation Methodology Reforms:**

(i)   Requiring incident specificity and factual verification for all coaching complaints;

       (ii)    Implementing comparative analyses between similar behaviors from male versus female coaches;

      (iii)   Training investigators to identify stereotype effects in complaint formation; and

      (iv)   Developing protocols to distinguish between actual misconduct and gender-biased perceptions of normal coaching.

The requested injunctive relief would not only remedy the harm to plaintiff, but also would establish Montclair State University as a leader in eliminating one of the last remaining forms of overt gender segregation in American society, serving both the public interest and the University's educational mission.  The relief sought also is consistent with the recent Executive Order by President Trump that emphasizes the importance of ensuring that employment decisions are based *solely on individual merit and free from bias or discrimination*.

The Executive Order underscores the longstanding principle of federal civil rights laws, which protect individuals from discrimination based on race, color, religion, sex, or national origin:

    **I.**    **Purpose**: Longstanding Federal civil-rights laws **protect individual Americans from discrimination** based on race, color, religion, sex, or national origin. Th**ese civil-rights protections serve as a bedrock supporting equality of opportunity for all Americans**. As President, I have a **solemn duty to ensure that these laws are enforced** for the benefit of all Americans.[1]

The Order goes on to state:

    Hardworking Americans who deserve a shot at the American Dream **should not be stigmatized, demeaned, or shut out of opportunities** because of their race or sex.[2]

---

[1] President Donald J. Trump, *Ending Illegal Discrimination and Restoring Merit-based Opportunity* (Executive Order Number and CFR citation unavailable) (available at https://www.whitehouse.gov/presidential-actions/2025/01/ending-illegal-discrimination-and-restoring-merit-based-opportunity/)

[2] This is consistent with statements of the acting Chair of the EEOC that she intends to: ". . . [r]einforce instead the fundamental belief enshrined in the Declaration of Independence and our civil rights laws— that all people are 'created equal.' I am committed to ensuring equal justice under the law and to **focusing**

The President's Executive Order reaffirms that the law prohibits any form of bias, prejudice, stereotype or discrimination from impacting the evaluation or treatment of individuals. Employment decisions must be objective, grounded in merit, and free from any assumptions that could unjustly deny opportunities to individuals. Any behavior or decision influenced by bias or prejudice undermines the protections that are the cornerstone of equality in America.

HELLRING LINDEMAN GOLDSTEIN & SIEGAL LLP

Dated: January 14, 2026        s/ Stephen L. Dreyfuss                        

A Member of the Firm
sldreyfuss@hlgslaw.com
103 Eisenhower Parkway, Suite 403
Roseland, New Jersey 07068-1031
Telephone: +1.973.621.9020
Direct: +1.973.621.9246
Fax: +1.973.621.7406

NEWKIRK ZWAGERMAN, P.L.C.

*s/ Thomas Newkirk*   
Thomas Newkirk
IA Bar No.  AT0005791
tnewkirk@newkirklaw.com
Myles Young
IA Bar No AT0015901
myoung@newkirklaw.com
3900 Ingersoll Ave, Suite 201
Des Moines, Iowa 50312
Tel: (515) 883-2000
Fax: (515) 883-2000
*Pro Hac Vice forthcoming*

Attorneys for Plaintiff

---

**on equal opportunity, merit, and colorblind equality**." (emphasis added)  We assume that when Acting Chair Lucas says "colorblind" in this context, she also includes genderblind.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues so triable.

HELLRING LINDEMAN GOLDSTEIN & SIEGAL LLP

Dated: January 14, 2026      s/ Stephen L. Dreyfuss

A Member of the Firm
sldreyfuss@hlgslaw.com
103 Eisenhower Parkway, Suite 403
Roseland, New Jersey 07068-1031
Telephone: +1.973.621.9020
Direct: +1.973.621.9246
Fax: +1.973.621.7406

NEWKIRK ZWAGERMAN, P.L.C.

*s/ Thomas Newkirk*
Thomas Newkirk
IA Bar No. AT0005791
tnewkirk@newkirklaw.com
Myles Young
IA Bar No AT0015901
myoung@newkirklaw.com
3900 Ingersoll Ave, Suite 201
Des Moines, Iowa 50312
Tel: (515) 883-2000
Fax: (515) 883-2000
*Pro Hac Vice forthcoming*

Attorneys for Plaintiff

486172